copy

Jay B. Itkowitz (JBI-5349)
ITKOWITZ PLLC
305 Broadway, 7th Floor
New York, New York 10007
(646) 822-1801
jitkowitz@itkowitz.com

JUDGE SULLIVAN

## 13 CV 7463

*Attorneys for Plaintiffs*
*Gro-Well Brands, Inc., Grow-Well Brands CP, Inc., and Western Organics, Inc.,*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

GRO-WELL BRANDS, INC., GROW-WELL BRANDS
CP, INC. and WESTERN ORGANICS, INC.,

                              Plaintiffs,

                    -against-

VAPORIZER LLC,

                              Defendant.
-------------------------------------------------------------X

**Index No.**

**VERIFIED COMPLAINT**

**PLAINTIFFS DEMAND A
TRIAL BY JURY**

RECEIVED
OCT 2 2 2013
U.S.D.C. S.D. N.Y.
CASHIERS

          Plaintiffs, Gro-Well Brands, Inc. and Gro-Well Brands CP, Inc., ("Gro-Well"),

and Western Organics Inc. ("Western"), (collectively "the Plaintiffs") by and through their

attorneys, Itkowitz PLLC, complaining of defendant, Vaporizer, LLC f/k/a "VAP Acquisition

Co. LLC" ("Vaporizer" or "the Defendant"), allege, as follows:

### SUMMARY OF THE ACTION

          1.          This is a diversity action brought by the Plaintiffs, for injunctive and

declaratory relief together with money damages, resulting from an anticipatory breach and

breach of the parties' written Asset Purchase Agreement entered into on or about October 16,

2012 ("the Agreement;" copy annexed as Exhibit "1").

          2.          Under the Agreement, Defendant is required to pay the balance owed on

purchase price in three separate post-acquisition annual settlement payments of $250,000 dollars,

60902/89407

commencing October 16, 2013, as well as an "Earnout" sum (the "Earnout Payment"), pursuant to § 2.5(c), calculated based on product sales occurring on or before December 15, 2016 (the "Earnout Date").

3.     Pursuant to § 9.9 of the Agreement, any matter arising out of or relating to the Agreement, and all the transactions it contemplates, may be litigated in the United States District Court for the Southern District of New York, if jurisdiction can be acquired.

4.     Accordingly, this action seeks immediate redress for injunctive and declaratory relief together with money damages, resulting from Defendant's multiple breaches of the Agreement.  Plaintiffs have been and will continue to be damaged in an amount to be determined at trial, but which is presently believed to be in excess of $750,000 dollars, plus interest, as well as costs and expenses, and reasonable attorneys' fees.

## JURY TRIAL DEMAND

5.     Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## THE PARTIES

6.     Plaintiff Gro-Well is a Delaware Corporation with its principal place of business located at 420 E. Southern Avenue, Tempe, Arizona 85282, and a citizen of Arizona.

7.     Plaintiff Western is a Delaware Corporation with its principal place of business at 420 E. Southern Avenue, Tempe, Arizona 85282, and a citizen of Arizona.

8.     Upon information and belief, Vaporizer was and is a Delaware limited liability company with its principal place of business at 46 Lathrop Road Ext., Plainfield, CT 06374.

9.     Vaporizer is a New York citizen because its sole member, the American

60902/89407

Rock Salt Company LLC ("American Rock"), is a citizen of New York.

10. Upon information and belief, American Rock is a New York LLC with its principal place of business located at 3846 Restof Road, Retsof, New York 14539 and a citizen of New York.

## JURISDICTION AND VENUE

11. Jurisdiction over this action is based upon the diversity statute, 28 U.S.C. §§ 1332(a)(1), (c)(1), because the amount in controversy exceeds $75,000, and Plaintiffs' principal place of business in Arizona is diverse from that of Defendant, a New York citizen.

12. The Court has personal jurisdiction over Defendant because Vaporizer (a) transacts business in the State of New York and (b) by virtue of the Agreement consented that any action arising out of it would be governed by New York law and expressly agreed to the jurisdiction of this Court.

13. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391, and because the parties agreed to the jurisdiction of this Court for adjudication of litigation arising under the Agreement.

## FACTUAL BACKGROUND

14. Upon information and belief, Vaporizer was and is a subsidiary company of the American Rock, which was and is a company that operates a salt mine in the State of New York.

15. Upon information and belief, Vaporizer LLC was organized, formed, and acquired to become a manufacturer and seller of agricultural products, specializing in the sale and distribution of ice melting rock salt and to work in conjunction with American Rock.

16. In or about September of 2012, Plaintiffs and Vaporizer entered into

60902/89407

negotiations (the "Negotiations") to facilitate the acquisition by Vaporizer of Plaintiffs' "Ice Melt Division" along with its complimentary business of manufacturing, selling, and packaging offseason agriculture and similar products to Vaporizer.

17.     Negotiations, which culminated in the Agreement dated October 16, 2012, were primarily conducted within New York State and the City of New York, between counsel, via e-mail and telephone communications.

18.     On or about October 16, 2012 (the "Closing Date"), Plaintiffs agreed to the structured sale of the "Ice Melt Division" to Vaporizer. *Exhibit 1.*

19.     Plaintiffs transferred and assigned the assets of the "Ice Melt" division including but not limited to its: Goodwill, Equipment, Inventory, Accounts Receivable, Existing Contracts and IP licenses, IP Assets, Domain Name, Manufacturing Facility located in Plainfield, CT ( the "45th Street Premises") and its contents (collectively the "Purchased Assets").   A schedule of the Purchased Assets is attached as Exhibit "2".

20.     Plaintiffs sold, assigned, and conveyed the Purchased Assets in exchange for the purchase price set forth in § 2.5 of the Agreement which included the post-acquisition payment of the balance of the total purchase price (the "Balance") as well the Earnout Payment to be paid at the conclusion of the installment plan.

21.     Under § 2.5(a) of the Agreement, the Balance was to be paid in three separate annual post-acquisition installments of $250,000 dollars each (the "Settlement Payments").   The Settlement Payments, which carried an imputed interest rate of 12%, were to be tendered on the Closing Date anniversary for three consecutive years as follows: (1) $250,000 in cash on October 16, 2013; (2) $250,000 in cash on October 16, 2014; and (3) $250,000 in cash on October 16, 2015.

60902/89407

22.    On May 9, 2013, Defendant tendered a payment in the amount of $435,558.16 for the sale of inventory pursuant to §§ 2.5(b) and 2.5(d) of the Agreement "in full satisfaction" of the parties respective claims pertaining to the inventory payment then due.  A copy of Executed Escrow Instructions issued in connection with this payment is attached as Exhibit "3".

23.    Pursuant to § 2.5(c),  the Earnout Payment, which is to be calculated based upon gross sales for a four year period from the Closing Date until the Earnout Date, is to be remitted on or before the Earnout Date.

24.    Moreover, pursuant to § 6.11, Defendant is obligated to furnish to Plaintiffs copies of Vaporizer's annual financial statements for each fiscal year until the Earnout date.

25.    Thus far, although one year has elapsed since the closing date, no such annual financial statement has been furnished.

26.    On or about September 25, 2013, Plaintiffs reminded Vaporizer that the first annual Settlement Payment of $250,000 was to become due on October 16, 2013, the first anniversary of the Closing Date.  A copy of this notice is attached as Exhibit "4".

27.    Counsel for Vaporizer responded by stating that he would relay the response from his client when he had it.  No such response was received.

28.    On or about October 15, 2013, one day prior to the first anniversary of the Closing Date, the date on which the first Settlement Payment became due and owing, Ann Blake, Vaporizer's Chief Financial Officer sent a detailed letter (the "Letter"), to Itkowitz PLLC on the Defendant's behalf.  A copy of the Letter is annexed as Exhibit "5".

29.    The Letter asserted certain "indemnification" claims against Plaintiffs, and

60902/89407

stated that it would not be tendering the Payment as Vaporizer was "electing" to exercise its right of "set-off", under § 2.8 of the Agreement .

30.    The first indemnification claim asserted by Vaporizer in the Letter is an indirect claim for indemnification against a Third Party Claim for Trademark infringement. *Exhibit 5.*

31.    The second indemnification claim asserted by Vaporizer is a direct claim regarding the quality and operating condition of certain equipment Vaporizer acquired among the Purchased Assets under the Agreement. *Id.*

32.    The third indemnification claim asserted by Vaporizer is a direct claim regarding the condition and salability of certain inventory Vaporizer acquired among the Purchased Assets under the Agreement. *Id.*

33.    The fourth indemnification claim asserted by Vaporizer is a direct claim for the settlement of an outstanding insurance claim, brought by a customer for alleged concrete damage suffered as a result of using Vaporizer "Premium Ice Melt" purported to be manufactured and produced prior to the Closing Date. *Id.*

34.    The fifth indemnification claim asserted by Vaporizer is a direct claim regarding a lapsed patent which was purportedly among the Purchased Assets under the Agreement. *Id.*

35.    The sixth and final indemnification claim asserted by Vaporizer is a direct claim for monies alleged to be owed by Plaintiffs for storage services and sums collected on accounts receivable presently owned by Vaporizer. *Id.*

36.    Vaporizer asserted no claims for indemnification as set forth in ¶¶ 29-34 prior to its agreement that the payment on May 9, 2013 was issued "in full satisfaction" of any

60902/89407

claims the respective parties might then have had with respect to the payment pursuant to §§ 2.5(a) and 2.5(d). Accordingly, the indemnification claims set forth in ¶¶ 30-31, 33-34 are barred.

37.    The Agreement at § 8.4 sets forth the procedure required of both Plaintiffs and Defendant when making indemnification claims against one another with regard to: (a) Third Party Claims, (b) Settlement of Third Party Claims, and (c) Direct Claims.

38.    With respect to direct claims, the Agreement at § 8.4(c) states that the party making a direct claim (the "Indemnified Party") is required to provide "reasonably prompt written notice thereof, but in any event not later than 30 days after the Indemnified party becomes aware of such Direct Claim" to the party against whom the claims are asserted (the "Indemnifying Party"). *Exhibit 1.*

39.    The Indemnified Party, pursuant to § 8.4(c), is further required to adequately describe the Direct Claim, provide copies of all material evidence, and allow the Indemnifying Party time to investigate the matter. If, after such notice is supplied, the Indemnifying Party fails to respond to the claim within fifteen days (15), the Indemnified Party "shall be free to pursue such remedies as may be available…" *Id.*

40.    Pursuant to § 2.8 of the Agreement, Defendant may set-off or reduce any amounts owed to Plaintiffs by the full amount of any obligation payable to it by Plaintiffs. *Id.*

41.    The right of set-off is subject to the notice and recovery procedures detailed in § 8.4 with regard to indemnification claims. *Id.*

42.    Defendant failed to supply timely notice of any of its indemnification claims (described above in ¶¶ 29-34) pursuant to either §§ 8.4(a) or 8.4(c) under the Agreement, or to provide Plaintiffs with the opportunity to investigate its allegations prior to its non-payment

60902/89407

of the first Settlement Payment.

43.     As such, Defendant was not entitled to exercise its right of set-off under §
2.8.

44.     Consequently, Defendant breached its obligation to remit the first
Settlement Payment on October 16, 2013.

### AS AND FOR A FIRST CAUSE OF ACTION
(Against Vaporizer for Unpaid Sums Owed And Anticipatory Breach of the Agreement)

45.     Plaintiffs repeat and re-allege the allegations contained in paragraphs "1"
through "44" of the Complaint as if fully set forth herein.

46.     The Agreement between Plaintiffs and Defendant is a valid and
enforceable contract.

47.     Under § 2.5 of the Agreement, Defendant had an obligation to pay
Plaintiffs the sum of $250,000 on October 16, 2013.

48.     Defendant has defaulted on its obligation by failing to pay the first
installment of $250,000 due and owing under the Agreement.

49.     Upon information and belief, Defendant has, by and through its actions,
anticipatorily repudiated its further obligations under the Agreement.

50.     Plaintiffs have fully and faithfully performed all of their obligations under
the Agreement.

51.     As a result of Vaporizer's anticipatory repudiation of the Agreement,
Plaintiffs have been deprived of the benefits owed to Plaintiffs under the Agreement namely, the
three annual Settlement Payments as provided for in § 2.5(a) of the Agreement.

52.     Based upon the foregoing, Plaintiffs have suffered and will continue to
suffer damages in an amount to be determined at trial, but presently believed to be in excess of

60902/89407

$750,000.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Breach of Contract)

53.    Plaintiffs repeat and re-allege the allegations contained in paragraphs "1" through "52" of the Complaint as if fully set forth herein.

54.    The Agreement between Plaintiffs and Defendant is a valid and enforceable contract.

55.    Plaintiffs have fully and faithfully performed all of their obligations under the Agreement.

56.    Vaporizer has failed to perform its obligations under the Agreement and has thereby materially breached the Agreement.

57.    As a result of Vaporizer's material breach of the Agreement, Plaintiffs have suffered loss of income, loss of future earnings and profits, and will continue to suffer damages under the Agreement in an amount to be determined at trial, but presently believed to be in excess of $750,000.00, plus interest, costs and expenses, and reasonable attorneys' fees.

## AS AND FOR A THIRD CAUSE OF ACTION

### (Breach of Contract)

58.    Plaintiffs repeat and re-allege the allegations contained in paragraphs "1" through "57" of the Complaint as if fully set forth herein.

59.    The Agreement between Plaintiffs and Defendant is a valid and enforceable contract.

60.    Under § 6.11 of the Agreement, Defendant had an obligation to issue Plaintiffs an annual financial statement for each fiscal year from the Closing Date until the

60902/89407

Earnout Date.

61.     Defendant has failed to issue such statements and has breached the Agreement as a result.

62.     Accordingly, Plaintiffs seek a declaratory order that Defendant is obligated to comply with its obligations pursuant to the Agreement and a permanent injunction so directing Vaporizer to faithfully issue such statements for each fiscal year from the Closing Date until the Earnout Date.

### AS AND FOR A FOURTH CAUSE OF ACTION

(Attorneys' Fees)

63.     Plaintiffs repeat and re-allege the allegations contained in paragraphs "1"-"62" of the Complaint as if fully set forth herein.

64.     Pursuant to § 9.9 of the Agreement, Plaintiffs are entitled to and Defendant is liable for attorneys' fees and costs and expenses, as a result of litigation arising under the Agreement.

65.     Accordingly, Plaintiffs are entitled to the award of reasonable attorneys' fees and costs incurred as a result of this action in an amount to be determined by the Court.

**WHEREFORE**, Plaintiffs demand judgment herein as follows:

(i)      on its first cause of action,  a judgment and/or order enjoining Vaporizer to specifically perform its obligation under the Agreement; or in the alternative, a judgment for money damages in an amount to be determined at trial, but presently believed to be in excess of $750,000.00, plus interest, costs and expenses;

(ii)     on its second cause of action, a judgment against Defendant for money damages in an amount to be

60902/89407

determined at trial, but presently believed to be in excess of $750,000.00, plus interest, costs and expenses;

(iii)     on its third cause of action, a declaratory judgment and/or order against Vaporizer enjoining it specifically to perform its obligation to issue annual financial statements as required by the Agreement so that the Earnout Payment can be properly calculated on the date of the final installment; and

(iv)     on its fourth cause of action, a judgment against the Defendant for reasonable attorneys' fees, costs and expenses; and,

(v)     for such other, further and different relief as is just, necessary and proper.

Dated:     New York, New York
          October 22, 2013

ITKOWITZ PLLC
Attorneys for Plaintiff

By: _____

Jay B. Itkowitz (JBI-5349)
305 Broadway, 7th Floor
New York, New York 10007
(646) 822-1801
jitkowitz@itkowitz.com

11

60902/89354

## VERIFICATION

STATE OF NEW YORK    )
                               )    ss:
COUNTY OF NEW YORK  )

        DAVID HANCOCK, being duly sworn, deposes and says:

        I am the Chief Executive officer of Gro-Well Brands, Inc. and of Western Organics, Inc., Plaintiffs.  I am authorized to act on behalf of Gro-Well Brands, Inc., and Western Organics, Inc, and for Plaintiffs. I have read the forgoing Verified Complaint and know the contents thereof.  The same is true to my own knowledge, except those matters therein which are stated to be alleged on information and belief, and as to those matters I believe them to be true.

                                      _____
                                      DAVID HANCOCK

Sworn to before me this
22nd day of October 2013



Notary Public

LINDA JACKSON
Notary Public - Arizona
Maricopa County
My Commission Expires
January 8, 2014

Exhibit 1

Execution Version

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of October 16, 2012, is entered into by and between GRO-WELL BRANDS, INC., a Delaware corporation ("**GWB**"), GRO-WELL BRANDS CP, INC., a Delaware corporation ("**CP**"), and WESTERN ORGANICS, INC., an Arizona corporation ("**Western Organics**", and together with GWB and CP, jointly and severally, "**Seller**"); and VAP ACQUISITION CO. LLC, a Delaware limited liability company ("**Buyer**").

## RECITALS

WHEREAS, Seller is engaged, through its "Ice Melt Division", in a business of manufacturing, packaging and selling ice melt products and is also engaged in a complementary business of manufacturing, packaging and selling offseason agriculture, landscaping and similar products that is based in and around Plainfield, Connecticut (collectively, the "**Business**"); and

WHEREAS, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, substantially all the assets, and certain specified liabilities, of the Business, subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I.
## DEFINITIONS

The following terms have the meanings specified or referred to in this ARTICLE I:

"**45th Street Premises**" means the real property leased by CP pursuant to the terms of the 45th Street Realty Lease.

"**45th Street Realty Lease**" means that certain Lease Agreement, dated as of June 30, 2006, by and between CP and 45th Street Realty, L.C. as amended by that certain Extension and Amendment of the Lease between the same parties.

"**Accounts Receivable**" has the meaning set forth in Section 2.1(a).

"**Acquisition Proposal**" has the meaning set forth in Section 6.3(a).

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Adjusted Inventory Payments**" has the meaning set forth in Section 2.5(b)(iv).

1877328v19

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**AR Credit**" has the meaning set forth in Section 2.4(a).

"**ARS**" has the meaning set forth in Section 2.5(c)(ii).

"**Assigned Contracts**" has the meaning set forth in Section 2.1(c).

"**Assignment and Assumption Agreement**" has the meaning set forth in Section 3.2(a)(ii).

"**Assumed Liabilities**" has the meaning set forth in Section 2.3.

"**Assumed Payables**" has the meaning set forth in Section 2.3.

"**Audited Financial Statements**" has the meaning set forth in Section 4.4.

"**Balance Sheet**" has the meaning set forth in Section 4.4.

"**Balance Sheet Date**" has the meaning set forth in Section 4.4.

"**Bill of Sale**" has the meaning set forth in Section 3.2(a)(i).

"**Books and Records**" has the meaning set forth in Section 2.1(l).

"**Business**" has the meaning set forth in the recitals.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in New York State are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Closing Certificate**" has the meaning set forth in Section 7.3(e).

"**Buyer Indemnitees**" has the meaning set forth in Section 8.2.

"**Buyer's Accountants**" means the accounting firm selected by Buyer.

"**Closing**" has the meaning set forth in Section 3.1.

"**Closing Date**" has the meaning set forth in Section 3.1.

2

"**Closing Inventory**" has the meaning set forth in Section 2.5(b)(i).

"**Closing Purchase Price Payment**" has the meaning set forth in Section 2.5(a).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"**CP**" has the meaning set forth in the preamble.

"**Customer List**" has the meaning set forth in Section 2.1(l)

"**Direct Claim**" has the meaning set forth in Section 8.4(b).

"**Disputed Amounts**" has the meaning set forth in Section 2.5(d)(i)(C).

"**Dollars or $**" means the lawful currency of the United States of America.

"**Earnout Date**" has the meaning set forth in Section 2.5(c).

"**Earnout Payment**" has the meaning set forth in Section 2.5(c).

"**Earnout Payment Assignment Agreement**" has the meaning set forth in Section 3.2(a)(viii).

"**Earnout Payment Statement**" has the meaning set forth in Section 2.5(c)(i).

"**EBITDA**" means, with respect to the time period measured, the earnings of the Business during such period, before interest, taxes, depreciation and amortization, all as determined in accordance with GAAP.

"**Employee Plan**" means any pension, retirement, profit-sharing, deferred compensation, stock purchase, stock option, bonus or other incentive plan, any program, arrangement, agreement or understanding relating to or otherwise affecting the delivery of medical, dental or other health benefits to current or former employees of the Business, any life insurance, accident, disability, workers' compensation, severance or separation plan, or any other employee benefit plan, including, without limitation, any Plan, and, with respect to all of the above, to which Seller or any ERISA Affiliate contributes or is a party or is bound or under which it may have liability and under which current or former employees of the Business are eligible to participate or derive a benefit.

"**Encumbrance**" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

3

"**Environmental Claim**" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**Environmental Notice**" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"**Environmental Permit**" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means, with respect to any Person, any other Person that, together with such first Person, would be treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"**Escrow Agent**" means The Bank of Castile.

"**Escrow Agreement**" has the meaning set forth in Section 2.5(b)(ii).

4

"**Excluded Assets**" has the meaning set forth in Section 2.2.

"**Excluded Contracts**" has the meaning set forth in Section 2.2(a).

"**Excluded Liabilities**" has the meaning set forth in Section 2.4.

"**Financial Statements**" has the meaning set forth in Section 4.4.

"**Forklift Leases**" has the meaning set forth in Section 2.4(n).

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**GWB**" has the meaning set forth in the preamble.

"**Handled**" means owned, leased, had an interest in, collected, accumulated, generated, transported, transferred, stored, manufactured, used, handled, recycled, reclaimed, processed, disposed of, contracted for the disposal of, or Released.

"**Hazardous Materials**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"**Inventory Sale Deadline**" has the meaning set forth in Section 2.5(b)(iii).

"**Indemnified Party**" has the meaning set forth in Section 8.4.

"**Indemnifying Party**" has the meaning set forth in Section 8.4.

"**Independent Accountants**" has the meaning set forth in Section 2.5(d)(i)(C).

"**Intellectual Property**" means all of the following and similar intangible property and related proprietary rights, interests and protections, however arising, pursuant to the Laws of any jurisdiction throughout the world: (a) trademarks, service marks, trade names, brand names, logos, trade dress and other proprietary indicia of goods and services, whether registered or

5

unregistered, and all registrations and applications for registration of such trademarks, including intent-to-use applications, all issuances, extensions and renewals of such registrations and applications and the goodwill connected with the use of and symbolized by any of the foregoing; (b) internet domain names, whether or not trademarks, registered in any top-level domain by any authorized private registrar or Governmental Authority; (c) original works of authorship in any medium of expression, whether or not published, all copyrights (whether registered or unregistered), all registrations and applications for registration of such copyrights, and all issuances, extensions and renewals of such registrations and applications; (d) confidential information, formulas, designs, devices, technology, know-how, research and development, inventions, methods, processes, compositions and other trade secrets, whether or not patentable; (e) patented and patentable designs and inventions, all design, plant and utility patents, letters patent, utility models, pending patent applications and provisional applications and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations and renewals of such patents and applications; and (f) all rights to sue and recover and retain damages, costs and attorneys' fees for past, present and future infringement and any other rights relating to any of the foregoing.

"**Intellectual Property Assets**" means all Intellectual Property that is owned by Seller and used in or necessary for the conduct of the Business as currently conducted.

"**Intellectual Property Assignments**" has the meaning set forth in Section 3.2(a)(iii).

"**Intellectual Property Licenses**" means all licenses, sublicenses and other agreements by or through which other Persons, including Seller's Affiliates, grant Seller exclusive or non-exclusive rights or interests in or to any Intellectual Property that is used in or necessary for the conduct of the Business as currently conducted.

"**Intellectual Property Registrations**" means all Intellectual Property Assets that are subject to any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"**Interim Balance Sheet**" has the meaning set forth in Section 4.4.

"**Interim Balance Sheet Date**" has the meaning set forth in Section 4.4.

"**Interim Financial Statements**" has the meaning set forth in Section 4.4.

"**Inventory**" has the meaning set forth in Section 2.1(b).

"**Inventory Payment Statement**" has the meaning set forth in Section 2.5(b)(iv).

"**Inventory Reimbursement**" has the meaning set forth in Section 2.5(b)(v).

"**Inventory Reimbursement Statement**" has the meaning set forth in Section 2.5(b)(v).

"**Inventory Sale Deadline**" has the meaning set forth in Section 2.5(b)(iv).

6

"**Knowledge of Seller or Seller's Knowledge**" or any other similar knowledge qualification, means the actual or constructive knowledge of any director or officer of Seller, after due inquiry.

"**Lepore**" has the meaning set forth in Section 3.2(a)(viii).

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Leased Real Property**" has the meaning set forth in Section 4.9(a).

"**Leases**" has the meaning set forth in Section 4.9(a).

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**Limited Trademark License Agreement**" has the meaning set forth in Section 2.1(e).

"**Loader Lease**" has the meaning set forth in Section 2.4(n).

"**Losses**" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; provided, however, that "Losses" shall not include punitive damages, except in the case of fraud or to the extent actually awarded to a Governmental Authority or other third party.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, prospects, condition (financial or otherwise) or assets of the Business, (b) the value of the Purchased Assets, or (c) the ability of Seller to consummate the transactions contemplated hereby on a timely basis.

"**Material Contracts**" has the meaning set forth in Section 4.6(a).

"**Multiemployer Plan**" means any multiemployer plan, within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA.

"**Net Working Capital**" means the amount by which current assets exceed current liabilities, all determined in accordance with GAAP.

"**Notice Period**" has the meaning set forth in Section 2.5(b)(vii).

"**Payment Statement**" has the meaning set forth in Section 2.5(c).

7

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**Permitted Encumbrances**" has the meaning set forth in 4.7.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Plan**" means any employee benefit plan (as defined in Section 3(3) of ERISA) maintained, contributed to or required to be contributed to Seller in which current or former employees participate.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"**Purchase Price**" has the meaning set forth in Section 2.5(a).

"**Purchased Assets**" has the meaning set forth in Section 2.1.

"**Release**" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Resolution Period**" has the meaning set forth in Section 2.5(d)(ii)(B).

"**Restricted Period**" has the meaning set forth in Section 6.6(a).

"**Review Period**" has the meaning set forth in Section 2.5(d)(i)(A).

"**Schedules**" means the Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement or as otherwise provided herein.

"**Sears Liability**" has the meaning set forth in Section 7.2(o).

"**Seller**" has the meaning set forth in the preamble.

"**Seller Closing Certificate**" has the meaning set forth in Section 7.2(j).

"**Seller Indemnitees**" has the meaning set forth in Section 8.3.

8

"**Seller's Accountants**" means the accounting firm selected by Seller.

"**Shortfall**" has the meaning set forth in Section 2.5(b)(v).

"**Statement of Objections**" has the meaning set forth in Section 2.5(d)(i)(B).

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Territory**" means the portion of the United States of America east of the Mississippi River.

"**Third Party Claim**" has the meaning set forth in Section 8.4(a).

"**Transaction Documents**" means this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, Intellectual Property Assignments, the Limited Trademark License Agreement, the Earnout Payment Assignment Agreement and the other agreements, instruments and documents required to be delivered at the Closing.

"**Union**" has the meaning set forth in Section 4.17(b).

"**WARN Act**" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

"**Western Organics**" has the meaning set forth in the preamble.

## ARTICLE II.
## PURCHASE AND SALE

2.1.    **Purchase and Sale of Assets**.    Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of any Encumbrances other than Permitted Encumbrances, all of Seller's right, title and interest in, to and under all of following assets owned, used or held for use in connection with the Business (collectively, the "**Purchased Assets**"):

(a)    all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing ("**Accounts Receivable**");

(b)    all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories ("**Inventory**");

9

(c)    all Contracts, including Intellectual Property Licenses, set forth on Schedule 2.1(c) hereto and the Loader Lease (the "**Assigned Contracts**");

(d)    all rights to the domain name http://www.vaporizericemelt.com;

(e)    all Intellectual Property Assets, including, without limitation, those listed on Schedule 2.1(e) and a non-exclusive, fully paid-up worldwide license to use the Gro-Well trademark on all of the Closing Inventory (including packaging inventory held for future use) that currently has the Gro-Well trademark on it as of Closing on the terms of a limited trademark license agreement in a form mutually agreed to by Buyer and Seller (the "**Limited Trademark License Agreement**");

(f)    all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property located at the 45th Street Premises and/or as described on Schedule 2.5(b)(i) including, without limitation, the tangible personal property described on Schedule 2.1(f) and all rights Seller has to the property leased under the Forklift Leases and the Loader Lease;

(g)    the right to occupy the 45th Street Premises;

(h)    all Permits, including Environmental Permits, which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Purchased Assets or the operation of the 45th Street Premises, including, without limitation, those listed on Schedule 4.15(a), but only to the extent such Permits may be transferred under applicable Law;

(i)    all rights to any Actions of any nature available to or being pursued by Seller to the extent related to the Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise;

(j)    all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of Taxes);

(k)    all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(l)    originals, or where not available, copies, of all books and records of the Business, including, but not limited to, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, including, without limitation, the customer list attached hereto as Schedule 2.1(l) (the "**Customer List**"), customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and

10

promotional surveys, material and research and intellectual property files relating to the Intellectual Property Assets and the Intellectual Property Licenses ("**Books and Records**"); and

       (m)    all goodwill and the going concern value of the Business.

    2.2.   **Excluded Assets**.  Notwithstanding the foregoing, the Purchased Assets shall not include the following assets (collectively, the "**Excluded Assets**"):

       (a)    all goodwill and customers lists for businesses of Seller other than the Business;

       (b)    the trademark "GRO-WELL" except pursuant to Section 2.1(e);

       (c)    Contracts, including Intellectual Property Licenses, that are not Assigned Contracts (the "**Excluded Contracts**");

       (d)    the corporate seals, organizational documents, minute books, stock books, Tax returns, books of account or other records having to do with the corporate organization of Seller;

       (e)    all Benefit Plans and assets attributable thereto; and

       (f)    the rights that accrue or will accrue to Seller under the Transaction Documents.

    2.3.   **Assumed Liabilities**.  Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only the following Liabilities of Seller (collectively, the "**Assumed Liabilities**"), and no other Liabilities:

       (a)    the Liabilities set forth on Schedule 2.5(a) up and only to the aggregate amount of the AR Credit;

       (b)    the assumed accounts payable set forth on Schedule 2.3(a) (the "**Assumed Payables**");

       (c)    the amounts remaining outstanding under the Forklift Leases;

       (d)    all Liabilities in respect of the Assigned Contracts but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business.

    2.4.   **Excluded Liabilities**.  Notwithstanding the provisions of Section 2.3 or any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**").  Seller shall, and shall cause each of its Affiliates to, pay and satisfy in due course all Excluded Liabilities which they are obligated to pay and satisfy.  Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)    any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(b)    any Liability for (i) Taxes of Seller (or any stockholder or Affiliate of Seller) or relating to the Business, the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period; (ii) Taxes that arise out of the consummation of the transactions contemplated hereby that are ordinarily the responsibility of a seller or that are the responsibility of Seller pursuant to Section 6.10; or (iii) other Taxes of Seller (or any stockholder or Affiliate of Seller) of any kind or description;

(c)    any Liabilities relating to or arising out of the Excluded Assets;

(d)    any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date;

(e)    any product Liability or similar claim for injury to a Person or property which arises out of, or is based, upon any express or implied representation, warranty, agreement or guaranty made by Seller, or by reason of the improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products at any time manufactured or sold or any service performed by Seller;

(f)    any recall, design defect or similar claims of any products manufactured or sold or any service performed by Seller;

(g)    any Liabilities of Seller arising under or in connection with any Benefit Plan providing benefits to any present or former employee of Seller;

(h)    any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(i)    any Environmental Claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing prior to the Closing or otherwise to the extent arising out of any actions or omissions of Seller;

(j)    any trade accounts payable of Seller;

(k)    any Liabilities of the Business relating or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders that (i) do not constitute part of the Purchased Assets issued by the Business' customers to Seller on or before the Closing; (ii) did not arise in the ordinary course of business; or (iii) are not validly and effectively assigned to Buyer pursuant to this Agreement;

12

(l)    any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same), except for indemnification of same pursuant to Section 8.3 as Seller Indemnitees;

(m)    any Liabilities under the Excluded Contracts or any other Contracts, (i) which are not validly and effectively assigned to Buyer pursuant to this Agreement; (ii) which do not conform to the representations and warranties with respect thereto contained in this Agreement; or (iii) to the extent such Liabilities arise out of or relate to a breach by Seller of such Contracts prior to Closing;

(n)    any Liabilities associated with debt, loans or credit facilities of Seller owing to financial institutions; provided, however, that this exclusion shall not include the payments becoming due on or after Closing (i) under that certain Lease Agreement dated on or around October 27, 2011 by and between GWB and General Electric Capital Corporation, which constitutes an Assigned Contract and pertains to a certain 2011 Doosan DL220 Wheel Loader (the "**Loader Lease**"), and (ii) under two certain Commercial Retail Installment Sale Contracts made by and between GWB and W.D. Matthews Machinery Co., dated October 5, 2011 and October 18, 2011, which pertain to two certain 2011 Doosan G30P Forklifts (the "**Forklift Leases**"); and

(o)    any Liabilities arising out of, in respect of or in connection with the failure by Seller or any of its Affiliates to comply with any Law or Governmental Order prior to Closing.

2.5.    **Purchase Price**.

(a)    In addition to the assumption of the Assumed Liabilities, the aggregate purchase price (the "**Purchase Price**") for the Purchased Assets shall be an amount equal to the sum of the following:  (i) $2,400,000 in cash at Closing (the "**Closing Purchase Price Payment**") less a credit for the credits Seller provided to customers for existing Accounts Receivable as set forth on Schedule 2.5(a) hereto (the "**AR Credit**") plus a credit to Buyer for the payment of $24,928.30 for an invoice that would otherwise be an Assumed Payable, with $900,000 of the Closing Purchase Price to constitute a refundable advance against the amount payable pursuant to Section 2.5(b), (ii) any amount payable to Seller in accordance with Section 2.5(b), (iii) $250,000 in cash on the first anniversary of the Closing Date, (iv) $250,000 in cash on the second anniversary of the Closing Date, (v) $250,000 in cash on the third anniversary of the Closing Date and (vi) the amount determined in accordance with Section 2.5(c). The Closing Purchase Price Payment shall be paid on the Closing Date by wire transfer of immediately available funds to an account designated no later than two Business Days prior to the Closing in writing by Seller to Buyer.  The balance of the Purchase Price shall be paid at the times set forth in this Agreement and the payments described in clauses (iii), (iv) and (v) of this Section 2.5(a) shall have an imputed interest rate of 12.5%.

(b)    **Sales Adjustment**.

(i)     Immediately prior to the Closing Date, Buyer and Seller shall conduct and agree on a complete physical count of inventory of the Inventory of the Business (the "**Closing Inventory**"), which, when so determined, shall be added to this Agreement as Schedule 2.5(b)(i) hereto.

(ii)     At Closing, Buyer shall deposit with Escrow Agent $500,000 of the Purchase Price (the "**Escrow Amount**") pursuant to the terms of a certain Escrow Agreement by and among Buyer, Seller and Escrow Agent substantially in the form attached to this Agreement as Exhibit A (the "**Escrow Agreement**");

(iii)     If Buyer receives $1,400,000 in good collected funds for sales to customers of the Closing Inventory after reductions for normal margins without discount before April 1, 2013 (the "**Inventory Sale Deadline**"), Buyer and Seller, within 15 days of reaching the conditions stated herein, shall deliver joint written instructions to Escrow Agent pursuant to the terms of the Escrow Agreement instructing Escrow Agent to deliver the entire Escrow Amount and all interest that has accrued thereon to Seller as an additional payment for the Closing Inventory, which shall be a payment made for the Closing Inventory in addition to the $900,000 advanced to Seller as part of the Closing Purchase Price Payment paid pursuant to Section 2.5(a)(i).

(iv)     If by the Inventory Sale Deadline, Buyer has not received at least $1,400,000 in good collected funds for sales to customers of the Closing Inventory after reductions for normal margins without discount but has received more than $900,000 in good collected funds for sales to customers of the Closing Inventory after reductions for normal margin without discount, a portion of the Escrow Amount plus a pro rata portion of interest earned thereon equal to the amount so received by Buyer (i.e., after reductions for normal margins without discount) above the $900,000 advanced to Seller as part of the Closing Purchase Price Payment paid pursuant to Section 2.5(a)(i) for the Closing Inventory shall be owed to Seller and the remainder of the Escrow Amount and the remaining interest accrued thereon shall be owed to Buyer in accordance with Section 2.5(d) (together such payments shall be referred to below as "**Adjusted Inventory Payments**"). If conditions stated herein are met, Buyer shall prepare and deliver to Seller no later than April 20, 2013 a statement setting forth in reasonable detail Buyer's calculation of the Adjusted Inventory Payments (the "**Inventory Payment Statement**").

(v)     If and to the extent that by the Inventory Sale Deadline, Buyer has generated less than $900,000 in good collected funds paid by customers for the Customer Inventory after reductions for normal margins without discount (a "**Shortfall**"), then Seller must reimburse Buyer an amount equal to such Shortfall (an "**Inventory Reimbursement**") in accordance with Section 2.5(d). Within 60 days of the Inventory Sale Deadline, if Buyer wishes to claim any Inventory Reimbursement against Seller, Buyer shall prepare and deliver to Seller a statement setting forth in reasonable detail Buyer's calculation of the Inventory Reimbursement (the "**Inventory Reimbursement Statement**").

(vi)     Any sales of inventory made by Seller listed on Schedule 2.5(b)(vi) will be credited towards the Buyer's sales of the Closing Inventory, for purposes of calculating the amounts sold pursuant to Sections 2.5(b)(iii), 2.5(b)(iv) and 2.5(b)(v) after

14

reductions for normal margins without discount, so long as such sales are included as Accounts Receivable transferred to Buyer pursuant to this Agreement and Buyer receives good collected funds therefor.

(vii)    Notwithstanding the foregoing in this Section 2.5(b), if commercially dictated by the condition of the Closing Inventory, Buyer shall have the right to sell the Closing Inventory at a higher discount on five-business days (the "**Notice Period**") prior notice to Seller.  Upon receipt of such prior notice, Seller can repurchase and take delivery of the Closing Inventory proposed to be sold by Buyer at a higher discount if it provides a written notice thereof and payment therefor prior to expiration of the Notice Period; provided, however, that Seller may, at its option, pay for such portion of the Closing Inventory by issuing a credit against payments from Buyer to Seller under Sections 2.5(b)(iii) through 2.5(b)(vi) and the disbursements so made from the Escrow Amount shall be adjusted accordingly.

(viii)    Buyer agrees to make commercially reasonable efforts to collect all amounts outstanding from customers owing money for sales of the Closing Inventory and, in any event, efforts consistent with current collection efforts made on behalf of ARS for accounts receivable owing to ARS.

(c)    **Earnout**.

(i)    On or before December 15, 2016, Buyer shall pay to Seller an amount equal to the lesser of (x) $750,000 or (y) the amount derived as follows: (i) three times the average annual EBITDA of the Business from the Closing Date to the fourth anniversary of the Closing Date (the "**Earnout Date**"); less (ii) the lesser of (A) $600,000 and (B) 10% of the average annual Net Working Capital of the Business from the Closing Date to the Earnout Date; less (iii) the greater of (A) $75,000 and (B) the average annual capital expenditure of the Business from Closing through the Earnout Date; and less (iv) $2.25 million; provided, however, that the Earnout shall never be less than $0 (the "**Earnout Payment**").  Within 60 days of the Earnout Date, Buyer shall prepare and deliver to Seller a statement setting forth in reasonable detail its calculation of the Earnout Payment (the "**Earnout Payment Statement**" and together with the Inventory Payment Statement and the Inventory Reimbursement Statement, each a "**Payment Statement**"

(ii)    American Rock Salt Company LLC ("**ARS**"), the parent company of Buyer, may sell salt to Buyer as part of the Business at the greater of (i) the last price for salt charged by ARS to Seller for the Business and (ii) the price regularly charged by ARS to distributors of its salt without any allowances or discounts for special market condition and this transfer pricing will be reflected in the EBITDA calculations made pursuant to this Section 2.5(c).

(iii)    ARS may charge a 3% commission rate to Buyer for sales of Buyer's rock salt only products and a 5% commission rate to Buyer for sales of Buyer's other products through ARS and its sales force and such commissions shall be deducted from EBITDA for purposes of calculating the Earnout Payment pursuant to this Section 2.5(c).

      (iv)    The payoffs and buyout made under the Forklift Leases and the Loader Leases on or after Closing by or on behalf Buyer shall be included as capital expenditures of the Business for purposes of calculating the Earnout Payment.

      (d)    **Final Inventory Adjustments and Earnouts**.

          (i)    **Examination and Review**.

             (A)    **Examination**.  After receipt of any Payment Statement, Seller shall have 30 days (a "**Review Period**") to review such Payment Statement.  During such Review Period, Seller and Seller's Accountants shall have access to the relevant books and records of Buyer, the personnel of Buyer and/or Buyer's Accountants to the extent that they relate to such Payment Statement, as Seller may reasonably request for the purpose of reviewing such Payment Statement and to prepare a Statement of Objections (defined below), provided, however, that such access shall be in a manner that does not interfere with the normal business operations of Buyer.

             (B)    **Objection**.  On or prior to the last day of such Review Period, Seller may object to the applicable Payment Statement by delivering to Buyer a written statement setting forth Seller's objections in reasonable detail,  indicating each disputed item or amount, and the basis for Seller's disagreement therewith (a "**Statement of Objections**").  If Seller fails to deliver the Statement of Objections before the expiration of such Review Period, the Adjusted Inventory Payments, the Inventory Reimbursement or the Earnout Payment, as applicable, shall be deemed to have been accepted by Seller.  If Seller delivers a Statement of Objections before the expiration of any Review Period, Buyer and Seller shall negotiate in good faith to resolve such objections within 30 days after the delivery of the Statement of Objections (a "**Resolution Period**"), and, if the same are so resolved within such Resolution Period, the Earnout Payment, the Adjusted Inventory Payments or the Inventory Reimbursement, as applicable, with such changes as may have been previously agreed in writing by Buyer and Seller, shall be final and binding.

             (C)    **Resolution of Disputes**.  If Seller and Buyer fail to reach an agreement with respect to all of the matters set forth in any Statement of Objection before expiration of the Resolution Period, then any amounts remaining in dispute ("**Disputed Amounts**") shall be submitted for resolution to the office of an impartial, nationally recognized firm of independent certified public accountants other than Seller's Accountants or Buyer's Accountants ("**Independent Accountants**"), selected by mutual agreement of Buyer and Seller, and who, acting as experts and not arbitrators, shall resolve the Disputed Amounts only and make any adjustments to the Earnout Payment, the Adjusted Inventory Payments or the Inventory Reimbursement, as applicable, and, as the case may be, the relevant Payment Statement.  Independent Accountants shall only decide the specific items under dispute by the parties and their decision for each Disputed Amount must be within the range of values assigned to each such item in the relevant Payment Statement and Statement of Objections, respectively.  The prevailing party shall be entitled to recover its costs and expenses, including, but not limited to any and all professional fees.

(D)  **Determination by Independent Accountants**.  The Independent Accountants shall make a determination as soon as practicable within 30 days (or such other time as the parties hereto shall agree in writing) after their engagement, and their resolution of the Disputed Amounts and their adjustments to the Earnout Payment, the Adjusted Inventory Payments or the Inventory Reimbursement, as applicable, and, as the case may be, the relevant Payment Statement shall be conclusive and binding upon the parties hereto.

(E)  **Payments of Adjustment**.  Except as otherwise provided herein, any payment of the Earnout Payment, the Adjusted Inventory Payments or the Inventory Reimbursement, as applicable, shall (A) be due (x) within five Business Days of acceptance of the applicable Payment Statement or (y) if there are Disputed Amounts, then within five Business Days of the resolution described in Section 2.5(d)(i)(D) above; and (B) be paid by wire transfer of immediately available funds to such account as is directed by Buyer or Seller, as the case may be; provided, however, Buyer and Seller shall instead deliver corresponding joint written instructions within 15 days of acceptance of the Inventory Payment Statement to Escrow Agent pursuant to the terms of the Escrow Agreement if the payments in question relate to the Adjusted Inventory Payments.

(ii)  **Adjustments for Tax Purposes**.  Any payments made pursuant to Sections 2.5(c), 2.5(b), 2.5(d) or any combinations thereof, shall be treated as an adjustment to the Purchase Price by the parties for Tax purposes, unless otherwise required by Law.

2.6.  **Allocation of Purchase Price**.  Seller and Buyer agree that the Purchase Price and the Assumed Liabilities (plus other relevant items) shall be allocated among the Purchased Assets for all purposes (including Tax and financial accounting) as shown on the allocation schedule which, when determined, shall be attached hereto as Schedule 2.6.

2.7.  **Third Party Consents**.  To the extent that Seller's rights under any Contract or Permit constituting a Purchased Asset, or any other Purchased Asset, may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible.  If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by law and the Purchased Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.  Notwithstanding any provision in this Section 2.7 to the contrary, Buyer shall not be deemed to have waived its rights under Section 7.2(d) hereof unless and until Buyer either provides written waivers thereof or elects to proceed to consummate the transactions contemplated by this Agreement at Closing.

2.8.  **Set-Off**.  Notwithstanding anything to the contrary in this Agreement, and without prejudice to any other right it may have, Buyer shall have the right to and may at any

17

time set-off and reduce any amounts payable to the Seller under this Agreement by the full amount of any obligation payable by Seller to Buyer under this Agreement.

## ARTICLE III.
## CLOSING

3.1. **Closing**. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Harris Beach PLLC, 99 Garnsey Road, at 10:00 a.m. Eastern Time, on the second Business Day after all of the conditions to Closing set forth in ARTICLE VII are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

3.2. **Closing Deliverables**.

(a)     At the Closing, Seller shall deliver to Buyer the following:

(i)     a bill of sale in form and substance satisfactory to Buyer (the "**Bill of Sale**") and duly executed by Seller, transferring the tangible personal property included in the Purchased Assets to Buyer;

(ii)     an assignment and assumption agreement in form and substance satisfactory to Buyer (the "**Assignment and Assumption Agreement**") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

(iii)     assignments in form and substance satisfactory to Buyer (the "**Intellectual Property Assignments**") and duly executed by GWB, transferring all of GWB's right, title and interest in and to the Intellectual Property Assets listed on Schedule 2.1(e) to Buyer;

(iv)     the Limited Trademark License Agreement duly executed by GWB;

(v)     the Seller Closing Certificate;

(vi)     the certificates of the Secretary or Assistant Secretary of GWB, CP and Western Organics required by Section 7.2(k) and Section 7.2(l);

(vii)     such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement;

(viii)     the Earnout Payment Assignment Agreement among Seller, Buyer and Dominic Lepore ("**Lepore**") in form and substance satisfactory to Buyer (the "**Earnout Payment Assignment Agreement**") and duly executed by Seller and Lepore assigning 20% of Seller's right to the Earnout Payment to Lepore; and

18

(ix)    the Escrow Agreement duly executed by Seller;

(b)    At the Closing, Buyer shall deliver to Seller the following:

(i)    the Closing Purchase Price Payment;

(ii)    the Escrow Amount to Escrow Agent;

(iii)    the Assignment and Assumption Agreement duly executed by Buyer;

(iv)    the Limited Trademark License Agreement duly executed by Buyer;

(v)    the Buyer Closing Certificate;

(vi)    the Earnout Payment Assignment Agreement duly executed by Buyer; and

(vii)    the Escrow Agreement duly executed by Buyer.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Schedules, Seller represents and warrants to Buyer that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

4.1.    **Organization and Qualification of Seller**.  GWB and CP are corporations duly organized, validly existing and in good standing under the Laws of the state of Delaware. Western Organics is a corporation duly organized, validly existing and in good standing under the Laws of the state of Delaware.  Together, Seller has full corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted.  Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary, including, without limitation, in the State of Connecticut.

4.2.    **Authority of Seller**.  Seller has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller.  This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms.  When each other Transaction Document

19

to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms.

4.3.    **No Conflicts; Consents**.  The execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Seller; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller, the Business or the Purchased Assets; (c) except as set forth in Schedule 4.3 hereto, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Permit to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on the Purchased Assets.  No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

4.4.    **Financial Statements**.  Complete copies of the audited financial statements including the balance sheet of the Business as at September 24, 2011, September 25, 2010 and September 26, 2009 for the fiscal years then ended (the "**Audited Financial Statements**"), and unaudited financial statements including the balance sheet of the Business as of August 25, 2012 and the 11-month period then ended (the "**Interim Financial Statements**" and together with the Audited Financial Statements, the "**Financial Statements**") have been delivered to Buyer.  The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Audited Financial Statements).  The Financial Statements are based on the books and records of the Business, and fairly present the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.  The balance sheet of the Business as of September 28, 2011 is referred to herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**" and the balance sheet of the Business as of August 25, 2012 is referred to herein as the "**Interim Balance Sheet**" and the date thereof as the "**Interim Balance Sheet Date**".  Seller maintains a standard system of accounting for the Business established and administered in accordance with GAAP.

4.5.    **Absence of Certain Changes, Events and Conditions**.  Since the Interim Balance Sheet Date, and other than in the ordinary course of business consistent with past practice, there has not been, with respect to the Business, any:

(a)     event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)     material change in any method of accounting or accounting practice for the Business, except as required by GAAP or as disclosed in the notes to the Financial Statements;

(c)     entry into any Contract that would constitute a Material Contract;

(d)     incurrence, assumption or guarantee of any indebtedness for borrowed money in connection with the Business except unsecured current obligations and Liabilities incurred in the ordinary course of business consistent with past practice;

(e)     transfer, assignment, sale or other disposition of any of the Purchased Assets shown or reflected in the Balance Sheet, except for the sale of Inventory in the ordinary course of business;

(f)     cancellation of any debts or claims or amendment, termination or waiver of any rights constituting Purchased Assets;

(g)     transfer, assignment or grant of any license or sublicense of any material rights under or with respect to any Intellectual Property Assets or Intellectual Property Licenses;

(h)     material damage, destruction or loss, or any material interruption in use, of any Purchased Assets, whether or not covered by insurance;

(i)     acceleration, termination, material modification to or cancellation of any Assigned Contract or Permit;

(j)     material capital expenditures which would constitute an Assumed Liability;

(k)     imposition of any Encumbrance upon any of the Purchased Assets;

(l)     grant of any bonuses, whether monetary or otherwise, or increase in any wages, salary, severance, pension or other compensation or benefits in respect of any employees, officers, directors, independent contractors or consultants of the Business, other than as provided for in any written agreements or required by applicable Law, (ii) change in the terms of employment for any employee of the Business or any termination of any employees for which the aggregate costs and expenses exceed $10,000, or (iii) action to accelerate the vesting or payment of any compensation or benefit for any employee, officer, director, consultant or independent contractor of the Business;

(m)     adoption, modification or termination of any: (i) employment, severance, retention or other agreement with any current or former employee, officer, director, independent contractor or consultant of the Business, (ii) Benefit Plan, or (iii) collective bargaining or other agreement with a Union, in each case whether written or oral;

21

(n)    any loan to (or forgiveness of any loan to), or entry into any other transaction with, any directors, officers or employees of the Business;

(o)    adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law;

(p)    purchase, lease or other acquisition of the right to own, use or lease any property or assets in connection with the Business for an amount in excess of $5,000 individually (in the case of a lease, per annum) or $25,000 in the aggregate (in the case of a lease, for the entire term of the lease, not including any option term), except for purchases of Inventory or supplies in the ordinary course of business consistent with past practice; or

(q)    any Contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

4.6.    **Material Contracts**.

(a)    Schedule 4.6 hereto lists each of the following Contracts (x) by which any of the Purchased Assets are bound or affected or (y) to which Seller is a party or by which it is bound in connection with the Business or the Purchased Assets (such Contracts, together with all Contracts concerning the occupancy, management or operation of any real property (including without limitation, brokerage contracts) listed or otherwise disclosed in Schedule 4.9(a) hereto and all Contracts relating to Intellectual Property set forth in Schedules 4.10(c) and 4.10(e) hereto, being "**Material Contracts**"):

(i)    all Contracts involving aggregate consideration in excess of $5,000 and which, in each case, cannot be cancelled without penalty or without more than 90 days' notice;

(ii)    all Contracts that require Seller to purchase or sell a stated portion of the requirements or outputs of the Business or that contain "take or pay" provisions;

(iii)    all Contracts that provide for the indemnification of any Person or the assumption of any Tax, environmental or other Liability of any Person;

(iv)    all Contracts that relate to the acquisition or disposition of any business, a material amount of stock or assets of any other Person or any real property (whether by merger, sale of stock, sale of assets or otherwise);

(v)    all broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts;

22

(vi)    all employment agreements and Contracts with independent contractors or consultants (or similar arrangements) and which are not cancellable without material penalty or without more than 90 days' notice;

(vii)    except for Contracts relating to trade receivables, all Contracts relating to indebtedness (including, without limitation, guarantees);

(viii)    all Contracts with any Governmental Authority;

(ix)    all Contracts that limit or purport to limit the ability of Seller to compete in any line of business or with any Person or in any geographic area or during any period of time;

(x)    all joint venture, partnership or similar Contracts;

(xi)    all Contracts for the sale of any of the Purchased Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the Purchased Assets;

(xii)    all powers of attorney with respect to the Business or any Purchased Asset;

(xiii)    all collective bargaining agreements or Contracts with any Union; and

(xiv)    all other Contracts that are material to the Purchased Assets or the operation of the Business and not previously disclosed pursuant to this Section 4.6.

(b)    Each Material Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. None of Seller or, to Seller's Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) in any material respect, or has provided or received any notice of any intention to terminate, any Material Contract. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to Buyer. There are no material disputes pending or threatened under any Contract included in the Purchased Assets.

4.7.    <u>Title to Purchased Assets</u>. Except as set forth in <u>Schedule 4.7</u> hereto and the Encumbrances that will be released as of Closing, Seller has good and valid title to, or a valid leasehold interest in, all Tangible Personal Property included in the Purchased Assets, free and clear of Encumbrances except for the following (collectively referred to as "**Permitted Encumbrances**"):

23

(a)    liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures and for which there are adequate accruals or reserves on the Balance Sheet existing until the Closing Date;

(b)    mechanics', carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business consistent with past practice in amounts that are not delinquent and which are not, individually or in the aggregate, material to the Business or the Purchased Assets existing until the Closing Date; or

(c)    easements, rights of way, zoning ordinances and other similar encumbrances affecting real property which are not, individually or in the aggregate, material to the Business or the Purchased Assets, which do not prohibit or interfere with the current operation of any real property and which do not render title to any real property unmarketable.

4.8.    **Condition and Sufficiency of Assets**.

(a)    The buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property included in the Purchased Assets are structurally sound, are in operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.  The Purchased Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted.

(b)    All of the Inventory is in useable and saleable condition.

4.9.    **Real Property**.

(a)    Schedule 4.9(a) sets forth each parcel of real property leased by Seller and used in or necessary for the conduct of the Business as currently conducted (together with all rights, title and interest of Seller in and to leasehold improvements relating thereto, including, but not limited to, security deposits, reserves or prepaid rents paid in connection therewith, collectively, the "**Leased Real Property**"), and a true and complete list of all leases, subleases, licenses, concessions and other agreements (whether written or oral), including all amendments, extensions renewals, guaranties and other agreements with respect thereto, pursuant to which Seller holds any Leased Real Property (collectively, the "**Leases**").  Seller has delivered to Buyer a true and complete copy of each Lease.  With respect to each Lease:

(i)    such Lease is valid, binding, enforceable and in full force and effect, and Seller enjoys peaceful and undisturbed possession of the Leased Real Property;

(ii)    Seller is not in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both,

would constitute such a breach or default, and Seller has paid all rent due and payable under such Lease;

(iii)    Seller has not received nor given any notice of any default or event that with notice or lapse of time, or both, would constitute a default by Seller under any of the Leases and, to the Knowledge of Seller, no other party is in default thereof, and no party to any Lease has exercised any termination rights with respect thereto;

(iv)    Seller has not subleased, assigned or otherwise granted to any Person the right to use or occupy such Leased Real Property or any portion thereof; and

(v)    Seller has not pledged, mortgaged or otherwise granted an Encumbrance on its leasehold interest in any Leased Real Property.

(b)    Seller has not received any written notice of (i) material violations of building codes and/or zoning ordinances or other governmental or regulatory Laws affecting the Leased Real Property, (ii) existing, pending or threatened condemnation proceedings affecting the Leased Real Property, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to materially and adversely affect the ability to operate the Leased Real Property as currently operated. Neither the whole nor any material portion of any Leased Real Property has been damaged or destroyed by fire or other casualty.

(c)    The 45th Street Premises is sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitutes all of the real property necessary to conduct the Business as currently conducted. Other than the 45th Street Premises, Seller has no interest in real property necessary to conduct the Business as currently conducted.

4.10.    **Intellectual Property**.

(a)    Schedule 4.10(a) hereto lists all (i) Intellectual Property Registrations and (ii) Intellectual Property Assets that are not registered but that are material to the operation of the Business.  All required filings and fees related to the Intellectual Property Registrations have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars, and all Intellectual Property Registrations are otherwise in good standing.

(b)    Except as set forth in Schedule 4.10(b) hereto, Seller owns, exclusively or jointly with other Persons, all right, title and interest in and to the Intellectual Property Assets, free and clear of Encumbrances.

(c)    Schedule 4.10(c) hereto lists all Intellectual Property Licenses.  Seller has provided Buyer with true and complete copies of all such Intellectual Property Licenses to the extent they exist.  All such Intellectual Property Licenses are valid, binding and enforceable between Seller and the other parties thereto, and Seller and such other parties are in full compliance with the terms and conditions of such Intellectual Property Licenses.

25

(d)     The Intellectual Property Assets and Intellectual Property Licenses as currently or formerly owned, licensed or used by Seller and the conduct of the Business as currently and formerly conducted by Seller do not infringe, violate or misappropriate the Intellectual Property of any Person.  Seller has not received any communication, and no Action has been instituted, settled or, to Seller's Knowledge, threatened that alleges any such infringement, violation or misappropriation, and none of the Intellectual Property are subject to any outstanding Governmental Order.

(e)     Schedule 4.10(e) hereto lists all licenses, sublicenses and other agreements pursuant to which Seller grants rights or authority to any Person with respect to any Intellectual Property Assets or Intellectual Property Licenses.  Seller has provided Buyer with true and complete copies of all such agreements.  All such agreements are valid, binding and enforceable between Seller and the other parties thereto, and Seller and such other parties are in full compliance with the terms and conditions of such agreements.  No Person has infringed, violated or misappropriated, or is infringing, violating or misappropriating, any Intellectual Property Assets.

4.11.  **Accounts Receivable**.  The Accounts Receivable reflected on Schedule 4.11 hereto (a) have arisen from bona fide transactions entered into by Seller involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; and (b) constitute only valid, undisputed claims of Seller not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice.  Since August 1, 2012, collections and payments made for any accounts receivable of the Business have been made only in the ordinary course of business and the underlying sales have not been made at discounts except in the ordinary course of business.

4.12.  **Customers**.  Seller has not received any notice, and has no reason to believe, that any of the customers on the Customer List has ceased, or intends to cease after the Closing, to use the goods or services of the Business or to otherwise terminate or materially reduce its relationship with the Business.

4.13.  **Legal Proceedings; Governmental Orders**.

(a)     There are no Actions pending or, to Seller's Knowledge, threatened against or by Seller (a) relating to or affecting the Business, the Purchased Assets or the Assumed Liabilities; or (b) that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.  No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b)     There are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against, relating to or affecting the Business.

4.14.  **Compliance With Laws**.  Seller has complied, and is now complying, with all Laws applicable to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets.

4.15.  **Environmental and Other Permits; Hazardous Materials; Disposal Sites.**

(a)  Seller currently holds all Permits, including Environmental Permits, necessary and appropriate for the current use and operation of the Business, and all such Permits are in full force and effect.  Seller has not received any notice from any Governmental Authority revoking, canceling, rescinding, materially modifying or refusing to renew any Permit.  Schedule 4.15(a) hereto identifies all Permits and pending applications for new or renewed Permits of Seller related to the Business.

(b)  The Business has been operated in compliance with all applicable Permits and Environmental Laws.  Neither Seller nor the Business has received any written notice of a violation, citation or other communication from a Governmental Authority or any other Person alleging or related to the investigation of any alleged violation of an Environmental Law relating to the operation of the Business that is not fully resolved, and there are no non-compliance orders, warning letters, Actions, investigations or proceedings pending or in existence that reasonably could result in a Loss.

(c)  Neither Seller nor any predecessor of Seller has ever Handled any Hazardous Materials in connection with the operation of the Business or use or operation of the Assets other than in compliance with Environmental Laws.

(d)  No Encumbrance with respect to Environmental Liabilities has been threatened or imposed against any of the Assets under any Environmental Law or other applicable Law, and no facts or circumstances exist which would give rise to the same.

4.16.  **Employee Benefit Matters.**

(a)  Seller have furnished Buyer with copies of the current plan documents (and all amendments), summary plan descriptions, or other documents that set forth the terms of all Employee Plans, and such Employee Plans are listed in Schedule 4.16 hereto.

(b)  Except as set forth in Schedule 4.16 hereto, no current or former employee of the Business is a participant in any Multiemployer Plan.

(c)  Except as provided in Schedule 4.16 hereto, no entity that is or at any time in the past has been a member of Seller's "controlled group" or to which Seller is a "successor" (as those terms are defined by ERISA Section 4001(14) (an "**ERISA Affiliate**") has ever sponsored or contributed to a plan that is covered by Title IV of ERISA.

(d)  None of the Purchased Assets is subject to any lien under Code Section 401(a)(29), Code Section 412(n), ERISA Section 302(f), or ERISA Section 4068 or arising out of any action filed under ERISA Section 4301(b).

(e)  Neither Seller nor any ERISA Affiliate has incurred any liability which could subject Buyer, or any asset of Buyer or any of the Purchased Assets to liability under ERISA Sections 4062 et seq.

(f)     Neither Seller nor any ERISA Affiliate has incurred or will incur because of the transactions contemplated in this Agreement any withdrawal liability within the meaning of ERISA Section 4201 or any contingent withdrawal liability under ERISA Section 4204 to any Multiemployer Plan.

(g)     No event has occurred with respect to Seller or any ERISA Affiliate that could result in an assessment of withdrawal liability within the meaning of ERISA Section 4201 or any contingent withdrawal liability under ERISA Section 4204 to any Multiemployer Plan.

(h)     All of the Employee Plans which are subject to Code Section 4980B and Part 6 of Title I of ERISA are in compliance in all respects with the requirements of such Section.

4.17.   **Employment Matters**.

(a)     Schedule 4.17 hereto contains a list of all persons who are employees, independent contractors or consultants of the Business as of the date hereof, and sets forth for each such individual the following: (i) name; (ii) title or position (including whether full or part time); (iii) hire date; (iv) current annual base compensation rate; (v) commission, bonus or other incentive-based compensation; and (vi) a description of the fringe benefits provided to each such individual as of the date hereof. As of the date hereof, all compensation, including wages, commissions and bonuses payable to employees, independent contractors or consultants of the Business for services performed on or prior to the date hereof have been paid in full and there are no outstanding agreements, understandings or commitments of Seller with respect to any compensation, commissions or bonuses.

(b)     Seller is not, and has not been for the past three years, a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization (collectively, "**Union**"), and there is not, and has not been for the past three years, any Union representing or purporting to represent any employee of Seller, and, to Seller's Knowledge, no Union or group of employees is seeking or has sought to organize employees for the purpose of collective bargaining. There has never been, nor has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor disruption or dispute affecting Seller or any employees of the Business. Seller has no duty to bargain with any Union.

(c)     Except as set forth in Schedule 4.17(c) hereto, to Seller's Knowledge, Seller is and has been in compliance in all material respects with all applicable Laws pertaining to employment and employment practices to the extent they relate to employees of the Business, including all Laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence and unemployment insurance. All individuals characterized and treated by Seller as consultants or independent contractors of the Business are properly treated as independent contractors under all applicable Laws. All employees of the Business classified as exempt under the Fair Labor Standards Act

28

and state and local wage and hour laws are properly classified.  Except as set forth in Schedule 4.17(c) hereto, there are no Actions against Seller pending, or to the Seller's Knowledge, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment of any current or former applicant, employee, consultant, volunteer, intern or independent contractor of the Business, including, without limitation, any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay, wages and hours or any other employment related matter arising under applicable Laws.

        (d)      The termination of Seller employees of the Business will not require notice to be made under the WARN Act.

      4.18.   **Taxes**.  Seller has duly filed, or will duly file in a timely manner, with the relevant Tax authorities all returns with respect to Taxes relating to Seller, including estimated Tax returns and other information returns and reports which they are required to file, and each such document is complete, accurate and in accordance with all requirements of applicable Law. There are no Tax liens in effect with respect to the Purchased Assets.  Except as set forth on Schedule 4.18 hereto, all Taxes required to be withheld, collected or deposited by Seller with respect to the Business have been timely withheld, collected or deposited and, to the extent required, have been paid to the relevant Tax authority.  Neither the Internal Revenue Service nor any other taxing authority or agency, domestic or foreign, is now asserting or, to the best of Seller's knowledge, threatening to assert against Seller any deficiency or claim for additional Taxes or interest thereon or penalties in connection therewith with respect to the Business.  Seller has not granted any waiver of any statute of limitations with respect to, or any extension of a period for the assessment of, any Tax with respect to the Business.

      4.19.   **Brokers**.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

      4.20.   **Canadian Operations**.  Seller has all permits, authority and qualifications necessary to operate the Business in Canada as Seller has operated at any time in the past three years.

      4.21.   **Trade Payables**.  Other than the Assumed Payables and those accounts payable disclosed on Schedule 4.21 hereto, Seller does not owe any amounts outstanding to any vendors or service providers to the Business.  The Assumed Payables were incurred in the ordinary course of business and do not relate to inventory already sold unless such sales are included in full in the Accounts Receivable.

      4.22.   **Full Disclosure**.  No representation or warranty by Seller in this Agreement and no statement contained in the Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

# ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this ARTICLE V are true and correct as of the date hereof.

5.1.    **Organization of Buyer**.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Delaware.

5.2.    **Authority of Buyer**.  Buyer has full power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite company action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.  When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms.

5.3.    **No Conflicts; Consents**.  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of formation, limited liability company agreement or other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under any Contract to which Buyer is a party.  No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

5.4.    **Brokers**.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

5.5.    **Sufficiency of Funds**.  Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

5.6.    **Legal Proceedings**.    There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.  No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

**ARTICLE VI.**
**COVENANTS**

6.1.    **Conduct of Business Prior to the Closing**.    From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Seller shall (x) conduct the Business in the ordinary course of business consistent with past practice; and (y) use reasonable best efforts to maintain and preserve intact its current Business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having relationships with the Business. Without limiting the foregoing, from the date hereof until the Closing Date, Seller shall:

      (a)    preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets;

      (b)    pay the debts, Taxes and other obligations of the Business when due;

      (c)    continue to collect Accounts Receivable in a manner consistent with past practice, without discounting such Accounts Receivable;

      (d)    maintain the properties and assets included in the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

      (e)    continue in full force and effect without modification all of its insurance policies, except as required by applicable Law;

      (f)    defend and protect the properties and assets included in the Purchased Assets from infringement or usurpation;

      (g)    perform all of its obligations under all Assigned Contracts;

      (h)    maintain the Books and Records in accordance with past practice;

      (i)    comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Purchased Assets; and

      (j)    not take or permit any action that would cause any of the changes, events or conditions described in Section 4.5 to occur.

6.2.    **Access to Information**.    From the date hereof until the Closing, Seller shall (a) afford Buyer and its Representatives full and free access to and the right to inspect all of the real property, properties, assets, premises, Books and Records, Contracts and other documents and data related to the Business; (b) furnish Buyer and its Representatives with such financial,

31

operating and other data and information related to the Business as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Seller to cooperate with Buyer in its investigation of the Business.  Any investigation pursuant to this Section 6.2 shall be conducted in such manner as not to interfere unreasonably with the conduct of the Business or any other businesses of Seller.  No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement.

6.3.    <u>No Solicitation of Other Bids</u>.

(a)    Seller shall not, and shall not authorize or permit any of its Affiliates or any of its or their Representatives to, directly or indirectly, (i) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal.  Seller shall immediately cease and cause to be terminated, and shall cause its Affiliates and all of its and their Representatives to immediately cease and cause to be terminated, all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to, an Acquisition Proposal.  For purposes hereof, "**Acquisition Proposal**" means any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) relating to the direct or indirect disposition, whether by sale, merger or otherwise, of all or any portion of the Business or the Purchased Assets.

(b)    In addition to the other obligations under this Section 6.3(a), Seller shall promptly (and in any event within three Business Days after receipt thereof by Seller or its Representatives) advise Buyer orally and in writing of any Acquisition Proposal, any request for information with respect to any Acquisition Proposal, or any inquiry with respect to or which could reasonably be expected to result in an Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the Person making the same.

(c)    Seller agrees that the rights and remedies for noncompliance with this Section 6.3 shall include having such provision specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Buyer and that money damages would not provide an adequate remedy to Buyer.

6.4.    <u>Employees and Employee Benefits</u>.

(a)    Commencing on the Closing Date, Seller shall terminate all employees of the Business who are actively at work on the Closing Date, and, at Buyer's sole discretion, Buyer may offer employment, on an "at will" basis, to any or all of such employees.

(b)    Seller shall be solely responsible, and Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, officer, director, independent contractor or consultant of the Business, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit

32

sharing benefits or severance pay for any period relating to the service with Seller at any time on or prior to the Closing Date and Seller shall pay all such amounts to all entitled persons on or prior to the Closing Date.

(c)     Seller shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits brought by or in respect of current or former employees, officers, directors, independent contractors or consultants of the Business or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or prior to the Closing Date. Seller also shall remain solely responsible for all worker's compensation claims of any current or former employees, officers, directors, independent contractors or consultants of the Business which relate to events occurring on or prior to the Closing Date. Seller shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.

6.5.    **Confidentiality**. From and after the Closing, Seller shall, and shall cause its Affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed, provided that Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

6.6.    **Non-competition; Non-solicitation.**

(a)    For a period of five years commencing on the Closing Date (the "**Restricted Period**"), Seller shall not, and shall not permit any of its Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in the Business in the Territory; (ii) have an interest in any Person that engages directly or indirectly in the Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the Business (including any existing or former client or customer of Seller and any Person that becomes a client or customer of the Business after the Closing), or any other Person who has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship. Notwithstanding the foregoing, Seller may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 1% or more of any class of securities of such Person.

(b)    During the Restricted Period, Seller shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit any person who is offered employment by Buyer pursuant to Section 6.4(a) or is or was employed in the Business during the Restricted Period, or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; provided, that nothing in this Section 6.6(b) shall prevent Seller or any of its Affiliates from hiring (i) any employee whose employment has been terminated by Buyer or (ii) after 180 days from the date of termination of employment, any employee whose employment has been terminated by the employee.

(c)    Seller acknowledges that a breach or threatened breach of this Section 6.6 would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by Seller of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(d)    Seller acknowledges that the restrictions contained in this Section 6.6 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this Section 6.6 should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable Law. The covenants contained in this Section 6.6 and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions

34

hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

6.7. **Public Announcements**. Unless otherwise required by applicable Law or stock exchange requirements (based upon the reasonable advice of counsel), no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement. For the avoidance of doubt, the restrictions set forth in this Section 6.7 do not apply to reporting requirements Buyer or Seller may have to institutional lenders, private investors or private holders of bonds or notes or any advisors of the foregoing.

6.8. **Bulk Sales Laws**. The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer; it being understood that any Liabilities arising out of the failure of Seller to comply with the requirements and provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction which would not otherwise constitute Assumed Liabilities shall be treated as Excluded Liabilities.

6.9. **Receivables**. From and after the Closing, if Seller or any of its Affiliates receives or collects any funds relating to any Accounts Receivable or any other Purchased Asset, Seller or its Affiliate shall remit such funds to Buyer within five Business Days after its receipt thereof. From and after the Closing, if Buyer or its Affiliate receives or collects any funds relating to any Excluded Asset, Buyer or its Affiliate shall remit any such funds to Seller within five Business Days after its receipt thereof.

6.10. **Transfer Taxes**. All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

6.11. **Reporting of Financial Information**. Buyer shall furnish to Seller, beginning from the date of Closing and through March 31, 2013, monthly sales reports including allowances for normal margins without discount, to be sent each month by the 10th day following the end of the month, to Alan Langer by email at amlanger@gro-well.com. Buyer shall further furnish to Seller, beginning from the date of Closing and through the Earnout Date, copies of the annual financial statements of Buyer after they are prepared for each fiscal year of Buyer. Unless compelled to divulge the same, Seller shall maintain the confidentiality of Buyer's non-public records, provided, however, that Seller may disclose the results of such financial statements with its attorneys and accountants.

6.12. **Payments After Closing**. It is hereby expressly understood and agreed that Seller shall have no interest in or right to any payments on the Accounts Receivable or the operation of the Business after Closing. If Seller receives any such payment after the Closing

Date attributable to the Accounts Receivable or the operation of the Business after Closing, Seller shall deliver to Buyer a bank check in the name of GWB made out to Buyer in an amount equal to such payments so received by Seller on the first or fifteenth day of the calendar month, whichever occurs first, after receipt; provided, however, that (i) no such delivery need to be made for any such payment sooner than fourteen days after Seller receives such payment and (ii) any such amounts due hereunder may instead be wired by Seller, at Seller's option, to an account of Buyer's choosing.

6.13.  **Delivery of Cancelled Check**.  Within 30 days of Closing, Seller must deliver to Buyer a copy of the cleared check delivered to Sears Holding Corporation (or an affiliate) contemporaneously at Closing in accordance with Section 7.2(o) and such other documentation supporting full payment of the Sears Liability as may be reasonably requested by Buyer.

6.14.  **Further Assurances**.  Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

## ARTICLE VII.
## CONDITIONS TO CLOSING

7.1.  **Conditions to Obligations of All Parties**.  The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

7.2.  **Conditions to Obligations of Buyer**.  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)  Other than the representations and warranties of Seller contained in Section 4.1, Section 4.2, Section 4.4 and Section 4.19, the representations and warranties of Seller contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).  The representations and warranties of Seller contained in Section 4.1, Section 4.2, Section 4.4 and Section 4.19 shall be true and correct in all respects on and as of

36

the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     No Action shall have been commenced against Buyer or Seller, which would prevent the Closing.  No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(d)     All approvals, consents and waivers that are listed on Schedule 4.3 hereto shall have been received, including, without limitation, those required for the assignment of the Loader Lease if the underlying property leased thereunder may not be purchased at Closing.

(e)     Buyer shall have agreed to a new lease on mutually agreeable terms with 45th Street Realty, L.C. for the 45th Street Premises.

(f)     From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(g)     Seller shall have delivered to Buyer duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in Section 3.2(a).

(h)     Buyer shall have received all Permits that are necessary for it to conduct the Business as conducted by Seller as of the Closing Date.

(i)     All Encumbrances relating to the Purchased Assets shall have been released in full, other than Permitted Encumbrances, and Seller shall have delivered to Buyer written evidence, in form satisfactory to Buyer in its sole discretion, of the release of such Encumbrances.

(j)     Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of GWB, CP and Western Organics, that each of the conditions set forth in Section 7.2(a) and Section 7.2(b) have been satisfied (the "**Seller Closing Certificate**").

(k)     Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of GWB, CP and Western Organics certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of Seller authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that

all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(l)     Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of GWB, CP and Western Organics certifying the names and signatures of the officers of each authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder.

(m)     Lepore and Chris Quesnelle shall have agreed to employment with Buyer in similar positions and on substantially similar terms as their current employment with Seller but in all cases with the status as an employee at will.

(n)     Seller shall have delivered to Buyer from any and all third parties vendors to the Business that are owed outstanding accounts payable amounts a portion of which Seller intends to pay after Closing and not including the Assumed Payables, releases and waivers in a form acceptable to Buyer in its sole and absolute discretion that (i) waive any right that such third parties might have to object to the transactions contemplated by this Agreement, (ii) release Buyer and its affiliates from any claim for or relating to such outstanding amounts and (iii) release any claims, liens and encumbrances such third parties may have to, against or in any of the Purchased Assets.  Seller shall have also provided proof of payment for all such other outstanding accounts payable owed by the Business as reasonably requested by Buyer.

(o)     Seller shall have paid that certain $87,758.02 liability owed to either Sears Holding Corporation or an affiliate (the "**Sears Liability**").

(p)     Buyer shall have received proposed payoff statements and lien release letters for the Loader Leases.

(q)     Buyer shall have received a proposed lien release letter relating to the Purchase Assets from Cole Taylor Bank regarding liens on the Purchased Assets.

(r)     Seller shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

7.3.    **Conditions to Obligations of Seller**.  The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of Buyer contained in Section 5.1, Section 5.2 and Section 5.4, the representations and warranties of Buyer contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that

38

address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects. The representations and warranties of Buyer contained in Section 5.1, Section 5.2 and Section 5.4 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(d)     Buyer shall have delivered to Seller duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in Section 3.2(b).

(e)     Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in Section 7.3(a) and Section 7.3(b) have been satisfied (the "**Buyer Closing Certificate**").

(f)     Buyer shall have delivered to Seller such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

## ARTICLE VIII.
## INDEMNIFICATION

8.1.    **Survival**.  Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is three years from the Closing Date; provided, that the representations and warranties in Section 4.1, Section 4.2, Section 4.7, Section 4.15, Section 4.19, Section 5.1, Section 5.2 and Section 5.4 shall survive indefinitely and the representations and warranties in Section 4.17 and Section 4.18 shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus 60 days. All covenants and agreements of the parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein.  Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

8.2.    **Indemnification By Seller**.  Subject to the other terms and conditions of this ARTICLE VIII, Seller shall indemnify and defend each of Buyer and its Affiliates and their respective Representatives (collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all

39

Losses incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of:

(a)    any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement, the other Transaction Documents or in any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement, the other Transaction Documents or any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement;

(c)    any Excluded Asset or any Excluded Liability; or

(d)    any Third Party Claim based upon, resulting from or arising out of the business, operations, properties, assets or obligations of Seller or any of its Affiliates (other than the Purchased Assets or Assumed Liabilities) conducted, existing or arising on or prior to the Closing Date.

8.3.    **Indemnification By Buyer**.  Subject to the other terms and conditions of this ARTICLE VIII, Buyer shall indemnify and defend each of Seller and its Affiliates and their respective Representatives (collectively, the "**Seller Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, with respect to or by reason of:

(a)    any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or in any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement; or

(c)    any Assumed Liability.

8.4.    **Indemnification Procedures**.  The party making a claim under this ARTICLE VIII is referred to as the "**Indemnified Party**", and the party against whom such claims are asserted under this ARTICLE VIII is referred to as the "**Indemnifying Party**".

(a)    **Third Party Claims**.  If any Indemnified Party receives notice of the assertion or commencement of any Action made or brought by any Person who is not a party to

40

this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "**Third Party Claim**") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party shall cooperate in good faith in such defense; provided, that if the Indemnifying Party is Seller, such Indemnifying Party shall not have the right to defend or direct the defense of any such Third Party Claim that (x) is asserted directly by or on behalf of a Person that is a supplier or customer of the Business, or (y) seeks an injunction or other equitable relief against the Indemnified Party. In the event that the Indemnifying Party assumes the defense of any Third Party Claim, subject to Section 8.4(b), it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right to participate in the defense of any Third Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. The fees and disbursements of such counsel shall be at the expense of the Indemnified Party, provided, that if in the reasonable opinion of counsel to the Indemnified Party, (A) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived, the Indemnifying Party shall be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party reasonably determines counsel is required. If the Indemnifying Party elects not to compromise or defend such Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, or fails to diligently prosecute the defense of such Third Party Claim, the Indemnified Party may, subject to Section 8.4(b), pay, compromise, defend such Third Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim. Seller and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including making available (subject to the provisions of Section 6.5) records relating to such Third Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

(b)     **Settlement of Third Party Claims.** Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third Party Claim without the prior written consent of the Indemnified Party, except as provided in this Section 8.4(b). If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides,

41

in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party.

          (c)    **Direct Claims**. Any Action by an Indemnified Party on account of a Loss which does not result from a Third Party Claim (a "**Direct Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 30 days after the Indemnified Party becomes aware of such Direct Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure; provided, however, that if the delay in notice results in the Indemnifying Party incurring any reasonable professional expenses and/or costs to protect its rights, Indemnified Party shall so indemnify the Indemnifying Party against any such costs and expenses. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have 15 days after its receipt of such notice to respond in writing to such Direct Claim. The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Indemnified Party's premises and personnel and the right to examine and copy any accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such 15-day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

       8.5.    **Payments**. Once a Loss is agreed to by the Indemnifying Party or finally adjudicated to be payable pursuant to this ARTICLE VIII, the Indemnifying Party shall satisfy its obligations within 15 Business Days of such final, non-appealable adjudication by wire transfer of immediately available funds.

       8.6.    **Tax Treatment of Indemnification Payments**. All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

       8.7.    **Effect of Investigation**. The representations, warranties and covenants of the Indemnifying Party, and the Indemnified Party's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of any investigation made by or on behalf of the Indemnified Party (including by any of its Representatives) or by reason of the fact that the Indemnified Party or any of its Representatives knew or should have known that any such representation or warranty is, was or might be inaccurate or by reason of the Indemnified Party's waiver of any condition set forth in Section 7.2 or Section 7.3, as the case may be.

8.8.    **Exclusive Remedies**.    Subject to Section 6.6 and Section 9.10, the parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims (other than claims arising from fraud, criminal activity or willful misconduct on the part of a party hereto in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this ARTICLE VIII.    In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this ARTICLE VIII.

## ARTICLE IX.
## MISCELLANEOUS

9.1.    **Expenses**.    Except as otherwise expressly provided herein, each party hereto shall bear its own expenses in connection with the negotiation, drafting and consummation of the transaction contemplated herein.

9.2.    **Notices**.    All notices, consents, demands, requests, approvals and other communications which are required or may be given hereunder shall be in writing and shall be sent by email as well as by one of the additional following methods, which shall be deemed to have been duly given (a) when delivered personally, (b) when sent by facsimile, upon receipt of a confirmation copy of said facsimile, (c) the next business day following the day on which the same has been delivered prepaid to a nationally recognized overnight courier service, or (d) if sent by mail, three business days following deposit in the mail as registered or certified, postage prepaid in each case.    All such notices shall be addressed as follows:

If to Seller:

                                     Itkowitz & Harwood
                                     Attn: Jay B. Itkowtiz
                                     305 Broadway
                                     7th Floor
                                     New York, New York
                                     Facsimile: 212-822-1401
                                     Email:  jitkowitz@itkowitz.com

If to Buyer:                       c/o American Rock Salt Company LLC

                                     Federal Express:
                                     3846 Retsof Road
                                     Retsof, New York 14539

                                     Mail:

43

PO Box 190
Mount Morris, New York 14510

Facsimile: 585-991-6957

Email:   Ann.Blake@americanrocksalt.com

Attn: Ann M. Blake, Chief Financial Officer

with a copy to:

Harris Beach PLLC
99 Garnsey Road
Pittsford, New York 14534
Attention: Christopher D. Jagel


9.3.    **Interpretation**.   For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.   Unless the context otherwise requires, references herein: (x) to Articles, Sections, Schedules and Exhibits mean the Articles and Sections of, and Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.   This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.  The Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

44

9.4.    **Assignment**.  This Agreement may not be assigned by either party hereto without the express written consent of the other parties hereto, provided that Buyer may assign some or all of its rights or obligations hereunder to an entity controlled by or under common control with Buyer without the prior written consent of Seller.  Any attempt to assign this Agreement in violation of this Section 9.4 shall be null, void and of no effect whatsoever.

9.5.    **Binding Effect; Benefit**.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

9.6.    **Severability**.  In the event that any provision or provisions of this Agreement shall be held to be invalid or unenforceable, the remaining provisions hereof shall nevertheless continue to be valid and enforceable as though the invalid portions were not a part hereof.

9.7.    **Waiver**.  No delay or failure of either party to exercise any right, remedy or power hereunder shall impair the same or be construed as a waiver thereof.  The waiver by either party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.

9.8.    **Entire Agreement**.  This Agreement, together with the Schedules and Exhibits hereto, embodies the entire agreement and understanding of the parties hereto with respect to the subject matter hereof, and supersedes any and all prior agreements or understandings between the parties and are merged into the terms of this Agreement.  This Agreement may be amended only by a writing signed by Buyer and Seller.

9.9.    **Applicable Law; Venue and Jurisdiction**.  The laws of the State of New York, without giving effect to its conflicts of law principles that would cause another jurisdiction's laws to apply, govern all matters arising out of or relating to this Agreement and all of the transactions it contemplates, including, without limitation, its validity, interpretation, construction, performance and enforcement.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may only be brought against any of the parties in the courts of the State of New York, County of New York, or, if it has or can acquire jurisdiction, in the United States District Court for the Southern District of New York, and each of the parties consents to the exclusive jurisdiction of such courts in any such action or proceeding and waives any objection to venue laid therein.  In the event of any dispute, the prevailing party shall be entitled to recover its costs and expenses, including, but not limited to, reasonable attorneys and accountants' fees.

9.10.    **Specific Performance**. The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

9.11.   **Counterparts**.  This Agreement may be signed in any number of counterparts, each of which is deemed to be an original and all of which, when taken together, shall constitute one and the same Agreement.  For all purposes, a facsimile or other electronic version (i.e., a pdf) of this executed Agreement is deemed to be an original.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**Seller**:

GRO-WELL BRANDS, INC.

By_____
Name:
Title:

GRO-WELL BRANDS CP, INC.

By_____
Name:
Title:

WESTERN ORGANICS, INC.

By_____
Name:
Title:

**Buyer**:

VAP ACQUISITION CO. LLC

By_____
Name: Ann M. Blake
Title: Chief Financial Officer

Signature Page to Asset Purchase Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**Seller**:

GRO-WELL BRANDS, INC.

By

Name: Alan Langer

Title: Chairman ; CFO

GRO-WELL BRANDS CP, INC.

By

Name: Alan Langer

Title: CEO

WESTERN ORGANICS, INC.

By

Name: Alan Langer

Title: CEO

**Buyer**:

VAP ACQUISITION CO. LLC

By

Name:

Title:

Signature Page to Asset Purchase Agreement

**Exhibit A**

**Form of Escrow Agreement**

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "**Agreement**"), effective as of the 16th day of October, 2012, is by and among **VAP ACQUISITION CO. LLC**, a Delaware limited liability company agreement with an address of c/o American Rock Salt Company LLC, 3846 Retsof Road, Retsof, New York 14539 ("**Buyer**"), **GRO-WELL BRANDS, INC.**, a Delaware corporation with an address of 420 E. Southern Avenue, Tempe, Arizona 85282 ("**GWB**"), **GRO-WELL BRANDS CP, INC.**, a Delaware corporation with an address of 420 E. Southern Avenue, Tempe, Arizona 85282 ("**CP**"), and **WESTERN ORGANICS, INC.**, an Arizona corporation with an address of 420 E. Southern Avenue, Tempe, Arizona 85282 (together with GWB and CP, jointly and severally, "**Seller**"), and **THE BANK OF CASTILE**, a commercial bank organized under the laws of the State of New York, with its principal place of business at 90 Main Street, Batavia, New York 14020 ("**Escrow Agent**").

## RECITALS:

A.      Seller and Buyer have entered into a certain Asset Purchase Agreement, dated even date herewith (the "**APA**"), pursuant to which, among other things, Seller has agreed to sell, transfer, convey, assign and deliver to Buyer certain assets of a business of manufacturing, packaging and selling ice melt products and a complementary business of manufacturing, packaging and selling offseason agriculture, landscaping and similar products based in and around Plainfield, Connecticut, all as set forth in greater detail in the APA.

B.      Pursuant to the terms and conditions of Section 2.5(b) of the APA, Seller and Buyer have agreed that $500,000 of the Purchase Price (as defined in the APA) shall be placed in escrow pending the determination of a certain sales adjustment determined in accordance with the terms of the APA, and subsequently released from escrow upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing recitals and the covenants set forth herein and in the APA, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      Purchaser is depositing with Escrow Agent, and Escrow Agent acknowledges receipt of the aggregate amount of $500,000 in immediately available US funds (which amount, together with any and all interest and earnings accrued thereon, being referred to the "**Escrow Funds**"). Escrow Agent agrees to hold the Escrow Funds in escrow in accordance with the terms and conditions set forth herein.

2.      Upon receipt of the joint written direction of Seller and Buyer, Escrow Agent will deposit the Escrow Funds in one or more business savings, money market or similar accounts offered by the Escrow Agent, which afford sufficient liquidity to permit withdrawals to fund disbursements from the Escrow Funds pursuant to this Agreement (collectively, the "**Permitted Accounts**"). In the event Escrow Agent has not received joint written direction from Seller and Buyer to invest the Escrow Funds, Escrow Agent shall, as soon as reasonably practicable and from time to time during the term of this Agreement, deposit the Escrow Funds, in its discretion,

in one or more Permitted Accounts.  Escrow Agent shall report any income on the Escrow Funds for tax purposes to GWB.

3.      Escrow Agent shall have the power, authority and discretion expressly conferred upon it by this Agreement, and shall not be required to perform any act or do any thing not within such power, authority and discretion, except upon the joint written instructions of Seller and Buyer substantially in the form attached as <u>ANNEX A</u> or in accordance with Section 2 (a "**Joint Instruction**").

4.      Escrow Agent may rely upon, and shall be protected in acting or refraining from acting upon, any Joint Instruction furnished to Escrow Agent hereunder and believed in good faith by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties.  Escrow Agent may conclusively presume that each of the undersigned has full power and authority to instruct Escrow Agent on behalf of the respective party for which each of the undersigned has signed.  Escrow Agent shall not be liable for any action taken by it in good faith without gross negligence and believed by it to be authorized or within the power, authority or discretion conferred upon it by this Agreement, and shall be protected in acting or refraining from acting in reliance upon an opinion of counsel or upon any certificate, request, instruction or other document believed by it to be genuine and to have been signed and presented by the proper party or parties.

5.      In the event that Escrow Agent (i) has not received a Joint Instruction from Seller and Buyer, as contemplated by Section 3 above, or (ii) is otherwise in doubt as to the action it should take hereunder, Escrow Agent shall be entitled to retain the Escrow Funds until Escrow Agent shall have received a final, non-appealable order directing delivery of the Escrow Funds from a court with jurisdiction over the parties.  Any such court order shall be accompanied by a legal opinion by counsel for the presenting party satisfactory to Escrow Agent to the effect that the order is final and non-appealable.  Escrow Agent shall act on such court order and legal opinion without further questions.

6.      For and in consideration of its services hereunder, Escrow Agent shall receive an annual fee equal to $1,500 and shall be entitled to receive reimbursement for any reasonable costs and expenses (including among others attorney fees) it incurs in connection with the performance of its duties hereunder.  All fees, costs and expenses due and payable to Escrow Agent hereunder shall be shared equally by Seller and Buyer, and shall be paid within 15 days following Escrow Agent's written request therefor.  Escrow Agent shall be jointly and severally indemnified and held harmless by Seller and Buyer against any loss, liability or expense incurred by Escrow Agent without gross negligence or bad faith on the part of Escrow Agent arising out of or in connection with its services hereunder, including the costs and expenses of defending itself against any claim of liability arising out of or in connection with its services hereunder.  Escrow Agent may deduct any unpaid obligations of the parties under this Section 6 from any disbursement from the Escrow Funds.  The provisions of Section 4 above and this Section 6 shall survive the termination of this Agreement and the resignation or removal of Escrow Agent.

7.      This Agreement shall terminate on the date upon which the Escrow Funds shall have been completely distributed pursuant to the terms and conditions contained herein.

2

8.     All notices required to be given pursuant to the terms and conditions of this Agreement shall be given in accordance with the terms and conditions set forth in Section 9.2 of the APA, provided, however, that the notice address for the Escrow Agent shall be The Bank of Castile, 90 Main Street, Batavia, New York 14020, Attn.: Mr. Thomas G. Dambra.

9.     Escrow Agent may resign as escrow agent hereunder for any reason upon 30 days' prior written notice to Seller and Buyer.  During such notice period, Buyer and Seller shall work together in good faith to identify and retain a successor escrow agent.  On or prior to the effective date of any such resignation, Escrow Agent shall transfer the Escrow Funds to the successor escrow agent identified in a Joint Instruction to be held in accordance with an escrow agreement to be entered into between Buyer, Seller and such successor escrow agent.  If no successor escrow agent shall have been so identified, Escrow Agent may deposit the Escrow Funds with a court and/or bring an interpleader action for direction as to disbursement of the Escrow Funds.

10.     This Agreement may not be amended, modified, supplemented or otherwise altered, except by a writing signed by all of the parties hereto.

11.     This Agreement, together with the APA, constitutes the entire agreement among the parties hereto with respect to the escrow of the Escrow Funds, and supersedes all prior understandings and agreements with respect thereto.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  This Agreement expressly sets forth all of the duties of Escrow Agent with respect to any and all matters pertinent hereto.  No implied duties or obligations shall be read into this Agreement against Escrow Agent.  Escrow Agent shall not be bound by the provisions of any agreement among the other parties hereto except this Agreement.

12.     This Agreement will be governed by, interpreted, construed and enforced in accordance with the laws of the State of New York, without regard to the conflict of laws rules of such state that would cause another jurisdiction's laws to apply.  Any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby ("**Action**") shall be brought in Genesee County, New York or in the United States Court for the Western District of New York located in Rochester, New York.  Each of the parties hereto hereby consents to the non-exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each party agrees that service of process on such party as provided in this Section 12 will be deemed effective service of process on such party.  Subject to Section 6, the substantially prevailing party in any Action shall be entitled to recover from the other party, in addition to any relief, or damages or other amounts that may be determined to be due, the reasonable fees and expenses of its attorneys in such Action.

3

13.    This Agreement may be signed in any number of counterparts, each of which is deemed to be an original and all of which, when taken together, shall constitute one and the same Agreement.  For all purposes, a facsimile or other electronic version (e.g., a pdf) of this executed Agreement is deemed to be an original.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Escrow Agreement as of the date first above written.

BUYER:

VAP ACQUISITION CO. LLC

By:_____
       Ann M. Blake, Chief Financial Officer

SELLER:

GRO-WELL BRANDS, INC.

By:_____
       Name:_____
       Title:_____

GRO-WELL BRANDS CP, INC.

By:_____
       Name:_____
       Title:_____

WESTERN ORGANICS, INC.

By:_____
       Name:_____
       Title:_____

ESCROW AGENT:

THE BANK OF CASTILE

By:    _____
       Name:_____
       Title:_____

<u>ANNEX A</u>

**<u>Form of Joint Instructions</u>**

The Bank of Castile
North Main Street
Castile, New York 14427

Ladies and Gentlemen:

      Reference is made to that certain Escrow Agreement, dated as of ___ October, 2012 (the "Escrow Agreement"), by and among **VAP ACQUISITION CO. LLC**, a Delaware limited liability company agreement with an address of c/o American Rock Salt Company LLC, 3846 Retsof Road, Retsof, New York 14539 ("**Buyer**"), **GRO-WELL BRANDS, INC.**, a Delaware corporation with an address of 420 E. Southern Avenue, Tempe, Arizona 85282, **GRO-WELL BRANDS CP, INC.** ("**GWB**"), a Delaware corporation with an address of 420 E. Southern Avenue, Tempe, Arizona 85282 ("**CP**"), and **WESTERN ORGANICS, INC.**, an Arizona corporation with an address of 420 E. Southern Avenue, Tempe, Arizona 85282 (together with GWB and CP, jointly and severally, "**Seller**"), and you.

      Pursuant to Section 4 of the Escrow Agreement, each of the undersigned hereby instructs you to disburse from the Escrow Funds, as defined in the Escrow Agreement, to the party or parties set forth on <u>Schedule 1</u> attached hereto, the respective amounts set forth opposite their names thereon.

| VAP ACQUISITION CO. LLC | GRO-WELL BRANDS, INC. |
|---|---|
| By:_____<br><br>    Name:_____<br>    Title:_____ | By:_____<br><br>    Name:_____<br>    Title:_____ |
| | GRO-WELL BRANDS CP, INC.<br><br>By:_____<br>    Name:_____<br>    Title:_____ |
| | WESTERN ORGANICS, INC.<br>By:_____<br>    Name:_____<br>    Title:_____ |

Exhibit 2

### Schedule 2.6

Allocation of Purchase Price

[Estimated subject to final approval]

| Section 2.1 Purchase and Sale of Assets | | APA Allocation |
|---|---|---|
| a | Accounts receivable | $ 304,618 |
| b | Inventory | $ 1,632,292 |
| c | Contracts/IP licenses - schedule 2.1c | $ - |
| d | Domain name | $ - |
| e | IP assets - schedule 2.1e | $ - |
| f | M&E - schedule 2.5(b)(i) and schedule 2.1(f) | $ 470,789 |
| g | Right to occupy 45th st | $ - |
| h | Permits - schedule 4.15(a) | $ - |
| i | Actions | $ - |
| j | Prepaid expenses | $ - |
| k | Warranty rights | $ - |
| l | Original books and records; customer list | $ - |
| m | Goodwill | $ 1,587,419.38 |
| | | $ 3,995,118 |

| Section 2.3 Assumed Liabilities | | |
|---|---|---|
| a | Liabilities - schedule 2.4a (<= AR credit) | $ 118,187 |
| b | Assigned contracts | $ 218,538 |
| | Deferred Payments | $ 595,336 |
| | Earnout Liability | $ - |

Exhibit 3

**Joint Instructions**

The Bank of Castile
North Main Street
Castile, New York 14427

Ladies and Gentlemen:

Reference is made to that certain Escrow Agreement, dated as of the 16th day of October, 2012 (the "**Escrow Agreement**"), by and among, **VAP ACQUISITION CO. LLC**, a Delaware limited liability company currently known as "**VAPORIZER, LLC**" with an address of c/o American Rock Salt Company LLC, 3846 Retsof Road, Retsof, New York 14539 ("**Buyer**"), **GRO-WELL BRANDS, INC.**, a Delaware corporation with an address of 420 E. Southern Avenue, Tempe, Arizona 85282, **GRO-WELL BRANDS CP, INC.** ("**GWB**"), a Delaware corporation with an address of 420 E. Southern Avenue, Tempe, Arizona 85282 ("**CP**"), and **WESTERN ORGANICS, INC.**, an Arizona corporation with an address of 420 E. Southern Avenue, Tempe, Arizona 85282 (together with GWB and CP, jointly and severally, "**Seller**"), and you.  Capitalized terms not defined herein shall have the meanings provided to them in the Escrow Agreement.

Pursuant to Section 4 of the Escrow Agreement, each of the undersigned hereby instructs you to disburse from the Escrow Funds, as defined in the Escrow Agreement, to the party or parties set forth on <u>Schedule 1</u> attached hereto, the respective amounts set forth opposite their names thereon.  The disbursement of the Escrow Funds will close out the escrow account.

The undersigned agree (i) that the amounts disbursed hereunder resolve in full any adjustments or payments due to either party, but only with respect to any changes or adjustments to or payments made under the Inventory Payment Statement as defined therein (the "**Relevant Sales Adjustment Provisions**"), pursuant to Section 2.5(b) of the APA or Section 2.5(d) of the APA, (ii) that there shall be no further claims made by either party for any amounts due with respect to the Inventory Payment Statement under the Relevant Sales Adjustment Provisions or any audit or accounting in connection therewith pursuant to the Relevant Sales Adjustment Provisions or otherwise and (iii) that the amounts disbursed hereunder also satisfies $39,441.84 currently owing from GWB to Buyer for certain co-packaging services provided prior to the date hereof as shown in further detail on <u>Schedule 2</u>.

[Signature page follows.]

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered these Joint Instructions as of the date first above written.

| VAPORIZER LLC formerly known as "VAP ACQUISITION CO. LLC" | GRO-WELL BRANDS, INC. |
|---|---|
| By: _____<br>Ann M. Blake, Chief Financial Officer | By: _____<br>Name: CHMN - ALAN LARSON<br>Title: CHMN |
| | GRO-WELL BRANDS CP. INC.<br><br>By: _____<br>Name: ALAN LARSON<br>Title: CEO |
| | WESTERN ORGANICS, INC.<br>By: _____<br>Name: ALAN LARSON<br>Title: CEO |

Signature Page to Joint Written Instructions

## Schedule 1

| Seller: **$435,558.16** | Bank name: | Cole Taylor Bank |
|---|---|---|
| | Bank Address: | 9550 West Higgins Road<br>Rosemont, Illinois 60018 |
| | ABA number: | 071000343 |
| | Account name: | Western Organics |
| | Account number: | 0692-73820 |
| Buyer:   **Remaining balance in escrow account.** | Bank name: | RBS CITIZENS BANK N.A. |
| | Bank Address: | 1 Citizens Drive<br>Riverside, Rhode Island 02915 |
| | ABA number: | 021313103 |
| | Account name: | Vaporizer LLC |
| | Account number: | 4011255024 |

## Schedule 2

See attached.

# STATEMENT

Vaporizer LLC

46 Lathrop Road Ext.
Plainfield, CT 06374

(860) 564-7225

Statement Date:     5/6/2013

Salesman:

Account No.: 000183

Remit To:     Vaporizer LLC
PO Box 347928

Pittsburgh  PA  15251-4928

Gro-Well Brands
PO Box 25406
Tempe AZ  85285-5406

| Invoice # | PO Number | Invoice Date | Due Date | Invoice Amount | Credits | Receipt Date | Received Amount | Balance | Finance Charges | Total Due |
|---|---|---|---|---|---|---|---|---|---|---|
| 0000959 | 48985606 | 04/12/13 | 04/27/13 | 1,998.00 | 0.00 | | 0.00 | 1,998.00 | 19.98 | 2,017.98 |
| 0000960 | 45985606 | 04/12/13 | 04/27/13 | 1,998.00 | 0.00 | | 0.00 | 1,998.00 | 19.98 | 2,017.98 |
| 0000964 | 25985606 | 04/15/13 | 04/30/13 | 1,998.00 | 0.00 | | 0.00 | 1,998.00 | 19.98 | 2,017.98 |
| 0000965 | 52985606 | 04/15/13 | 04/30/13 | 1,998.00 | 0.00 | | 0.00 | 1,998.00 | 19.98 | 2,017.98 |
| 0000966 | 56985606 | 04/15/13 | 04/30/13 | 1,998.00 | 0.00 | | 0.00 | 1,998.00 | 19.98 | 2,017.98 |
| 0000967 | 57985606 | 04/15/13 | 04/30/13 | 1,998.00 | 0.00 | | 0.00 | 1,998.00 | 19.98 | 2,017.98 |
| 0000968 | 49985606 | 04/15/13 | 04/30/13 | 1,332.00 | 0.00 | | 0.00 | 1,332.00 | 13.32 | 1,345.32 |
| 0000969 | 81985606 | 04/15/13 | 04/30/13 | 1,332.00 | 0.00 | | 0.00 | 1,332.00 | 13.32 | 1,345.32 |
| 0000973 | 14985606 | 04/17/13 | 05/02/13 | 1,332.00 | 0.00 | | 0.00 | 1,332.00 | 13.32 | 1,345.32 |
| 0000974 | 77985606 | 04/17/13 | 05/02/13 | 1,332.00 | 0.00 | | 0.00 | 1,332.00 | 13.32 | 1,345.32 |
| 0000975 | 28985606 | 04/17/13 | 05/02/13 | 1,332.00 | 0.00 | | 0.00 | 1,332.00 | 13.32 | 1,345.32 |
| 0000976 | 15985606 | 04/17/13 | 05/02/13 | 1,332.00 | 0.00 | | 0.00 | 1,332.00 | 13.32 | 1,345.32 |
| 0000977 | 20985606 | 04/17/13 | 05/02/13 | 1,332.00 | 0.00 | | 0.00 | 1,332.00 | 13.32 | 1,345.32 |
| 0000978 | 21985606 | 04/17/13 | 05/02/13 | 1,332.00 | 0.00 | | 0.00 | 1,332.00 | 13.32 | 1,345.32 |
| 0000979 | 77985606 | 04/17/13 | 05/02/13 | 1,332.00 | 0.00 | | 0.00 | 1,332.00 | 13.32 | 1,345.32 |
| 0000980 | 91985606 | 04/17/13 | 05/02/13 | 1,332.00 | 0.00 | | 0.00 | 1,332.00 | 13.32 | 1,345.32 |
| 0000981 | 38985606 | 04/17/13 | 05/02/13 | 1,332.00 | 0.00 | | 0.00 | 1,332.00 | 13.32 | 1,345.32 |
| 0000982 | 55985606 | 04/17/13 | 05/02/13 | 1,998.00 | 0.00 | | 0.00 | 1,998.00 | 19.98 | 2,017.98 |
| 0000983 | 44985606 | 04/17/13 | 05/02/13 | 1,998.00 | 0.00 | | 0.00 | 1,998.00 | 19.98 | 2,017.98 |
| 0001033 | 14992378 | 05/06/13 | 05/21/13 | 2,124.87 | 0.00 | | 0.00 | 2,124.87 | 0.00 | 2,124.87 |
| 0001034 | 77992378 | 05/06/13 | 05/21/13 | 2,124.87 | 0.00 | | 0.00 | 2,124.87 | 0.00 | 2,124.87 |
| 0001035 | 25992378 | 05/06/13 | 05/21/13 | 2,124.87 | 0.00 | | 0.00 | 2,124.87 | 0.00 | 2,124.87 |
| 0001036 | 20992378 | 05/06/13 | 05/21/13 | 2,124.87 | 0.00 | | 0.00 | 2,124.87 | 0.00 | 2,124.87 |
| | | | | | | | | 39,135.48 | 306.36 | 39,441.84 |

Exhibit 4

## Jay B Itkowitz

| | |
|---|---|
| **From:** | Jay B Itkowitz |
| **Sent:** | Wednesday, September 25, 2013 12:19 AM |
| **To:** | 'JBuhrman@harrisbeach.com' |
| **Cc:** | Alan M. Langer (amlanger@gro-well.com) |
| **Subject:** | 60902 Langer Vaporizer Sale |
| **Attachments:** | Wire Information Cole Taylor - Lockbox.docx |

John,

As you know, per 2.5(a)(iii), the $250,000 anniversary payment is due my client on October 16, 2013.  My client would appreciate it if your client could forward the payment soon due at its earliest convenience.

I have attached wire instructions.

Please advise when we can expect to receive payment.

Cordially,

Jay Itkowitz

<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<
Jay B. Itkowitz
Itkowitz PLLC
305 Broadway, 7th Floor
New York, New York 10007
jitkowitz@itkowitz.com
(646) 822-1801-o
(646) 996-6597-c
(212) 822-1402-fax
http://www.itkowitz.com

-----------------------------------------------
Confidentiality Notice:  This electronic mail transmission, including any attachments, may contain legally privileged and/or confidential information intended for a specific individual and purpose, and is protected by law.  Do not read this if you are not the person (s) named.  If you received this transmission in error, please notify the sender and delete the original transmission and its attachments without reading or saving in any manner; you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**Jay B Itkowitz**

| | |
|---|---|
| **From:** | John Buhrman <jbuhrman@HarrisBeach.com> |
| **Sent:** | Tuesday, October 01, 2013 12:16 PM |
| **To:** | Jay B Itkowitz |
| **Subject:** | RE: 60902 Langer Vaporizer Sale |

Jay:

I hope you are well.  Thank you for your emails and message.  I have passed along your message to our client and will let you know once I have a response from them to share.

**John Buhrman**
**Attorney**

# HARRIS BEACH PLLC

ATTORNEYS AT LAW
99 Garnsey Road
Pittsford, NY 14534
585.419.8651  Direct
585.419.8818  Fax
585.419.8800  Main
**Website  |  Bio  |  Add to Contacts**

p r a c t i c e G R E E N
Save a tree. Read, don't print, emails.

**From:** Jay B Itkowitz [mailto:jItkowitz@itkowitz.com]
**Sent:** Tuesday, October 01, 2013 11:23 AM
**To:** John Buhrman
**Subject:** 60902 Langer Vaporizer Sale

John,

Just called and left you a message. Any word on when my client can expect to receive the wire as indicated in the attached email?

Jay


<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<
Jay B. Itkowitz
Itkowitz PLLC
305 Broadway, 7th Floor
New York, New York 10007
jitkowitz@itkowitz.com
(646) 822-1801-o
(646) 996-6597-c
(212) 822-1402-fax
http://www.itkowitz.com


-----------------------------------------------

1

Confidentiality Notice: This electronic mail transmission, including any attachments, may contain legally privileged and/or confidential information intended for a specific individual and purpose, and is protected by law. Do not read this if you are not the person (s) named. If you received this transmission in error, please notify the sender and delete the original transmission and its attachments without reading or saving in any manner; you are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

**STATEMENT OF CONFIDENTIALITY**
This electronic message may contain privileged or confidential information. If you are not the intended recipient of this e-mail, please delete it from your system and advise the sender.

In accordance with Internal Revenue Service Circular 230, we inform  you that any discussion of a federal tax issue contained in this communication (including any attachments) is not intended or written to be used, and it cannot be used, by any recipient for the purpose of (i) avoiding penalties that may be imposed on the recipient under United States federal tax laws, or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

Exhibit 5



October 15, 2013

VIA EMAIL AND FACSIMILE

Itkowitz & Harwood
Attn: Jay B. Itkowitz
305 Broadway
7th Floor
New York, New York
Facsimile: 212-822-1401
Email: jitkowitz@itkowitz.com

Re:    <u>Rights of Setoff and Claims for Indemnification</u>

Dear Mr. Itkowitz:

I understand that you have contacted our counsel about the $250,000 payment described in Section 2.5(a)(iii) of that certain Asset Purchase Agreement, dated as of October 16, 2012, by and between your clients, Gro-Well Brands, Inc., Gro-Well Brands CP, Inc., and Western Organics, Inc. (jointly and severally, "**Seller**"), and Vaporizer LLC f/k/a/ "VAP Acquisition Co. LLC" ("**Vaporizer**"), as amended by that certain First Amendment to Asset Purchase Agreement dated April 11, 2013 (together, the "**APA**"). Capitalized terms not otherwise defined herein shall have the meanings given to such terms in the APA.

I am writing to advise you that, due to the claims against Seller described in this letter, and pursuant to Section 2.8 of the APA, Vaporizer is exercising its rights of setoff and will not be making the payment described in Section 2.5(a)(iii) of the APA. Vaporizer makes claims for indemnification pursuant to Section 8.2 of the APA against Seller for third party claims and direct claims related to Seller's breaches of representations, warranties, and covenants made to Vaporizer under the APA as described in further detail below. Section 8.4 of the APA governs the procedures for such claims.

- **Third Party Claim:**

  o Vaporizer is in receipt of a cease and desist letter and demand for accounting of profits dated September 27, 2013 sent on behalf of Sears Ecological Applications Co., LLC ("**Sears**") relating to Sears' "Ice Buster" registered trademark and the appearance of the phrase "Ice Buster" on Vaporizer packaging. The use of this phrase on Vaporizer packaging dates back to Seller's operation of the Business for years prior to Vaporizer's acquisition of the Business. A copy of the letter sent on behalf of Sears to Vaporizer is attached hereto as **<u>Exhibit A</u>**. Seller represented and warranted (i) that the Purchased Assets, including the Intellectual Property Assets, were "sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the

P.O. Box 190 | Mt. Morris, NY 14510
P. 860-564-7225
vaporizericemelt.com

Closing and [constituted] all of the rights, property and assets necessary to conduct the Business" as then conducted, (ii) that outside of liens discharged at Closing, Seller owned, "exclusively or jointly with other Persons, all right, title and interest in and to the Intellectual Property Assets free and clear of Encumbrances", and (iii) that the Intellectual Property Assets as then "currently or formerly owned, licensed or used by Seller [did] not infringe, violate or misappropriate the Intellectual Property" of any Person. Because Sears has asserted equitable claims, Vaporizer will retain control of the dispute raised by Sears as described in clause (y) of the fourth sentence of Section 8.4(a). Seller shall nonetheless retain indemnification responsibility relating to this dispute. If Sears ultimately prevails on its infringement claims, Vaporizer would incur substantial legal fees, suffer profit disgorgement related to products Vaporizer sold with the "Ice Buster" phrase since the Closing, owe actual damages to Sears for Vaporizer's use of the phrase since the Closing, suffer inventory losses both of packaged product and packaging supplies using the phrase, incur costs to redesign packaging, marketing, and other materials to remove the phrase, and otherwise lose the business benefit of using the phrase in the future, Vaporizer believes its exposure to related Losses would well exceed $250,000.

- **Direct Claims**:

  o As demonstrated on **Exhibit B** attached hereto, Vaporizer has had to spend at least $31,090.29 on repairs to and replacements for the equipment it purchased from Seller to bring such equipment (i) up to compliance with Occupation Health and Safety Administration rules and other applicable laws since the Closing and (ii) up to operating condition since the Closing. In addition, Vaporizer discovered after the Closing that certain equipment sold to it by Seller was inoperable and not repairable, which caused Vaporizer to suffer an additional $14,391 loss as demonstrated on **Exhibit C** attached hereto. Seller represented and warranted that it had complied with and was, at the time of the sale of the Business, complying with all laws applicable (i) "to the conduct of the Business as then currently conducted" or (ii) "the ownership or use of the Purchased Assets". Seller also represented and warranted that all equipment it sold to Vaporizer was in operating condition and repair and not in need of maintenance or repair that was material in nature or cost.

  o Seller represented and warranted that the Inventory was all in useable and saleable condition, but, in fact, $119,749.47 worth of Inventory, including inventory of summer product, was in unsalable condition at Closing as described in **Exhibit D** attached hereto.

  o As indicated on **Exhibit E** attached hereto, Vaporizer has recently received a claim for $1,945.96 from an insurance company for a customer that relates to claims that the customer allegedly suffered concrete damage while using Vaporizer "Premium Ice Melt" product that Seller sold prior to the Closing. We are able to determine that Seller sold the product prior to the Closing because a photograph of a bag of product the customer apparently used indicates that magnesium was part of the blend. We understand magnesium was replaced with calcium in this blend prior to the 2011-2012 season. Because Seller sold the product in question, this claim is an Excluded Liability under the APA and is Seller's responsibility.

  o The ice melt patent with a patent number of 6,894,199, which was purportedly valid and owned by Seller and assigned to Vaporizer at the Closing, had already expired due to Seller's nonpayment of the

3.5-year maintenance fee that was due by February 1, 2009. Please see **Exhibit F** attached hereto for further evidence of the issue. Seller has breached its representation and warranty "that all required filings and fees related to the Intellectual Property Registrations [had] been timely filed with and paid to the relevant Governmental Authorities and authorized registrars" and that "all Intellectual Property Registrations [were] otherwise in good standing". Vaporizer is in the process of determining the full extent of its Losses related to this breach.

As demonstrated above, Vaporizer believes in good faith that its total indemnification claims against Seller are well in excess of $250,000. Moreover, as indicated on **Exhibit G** attached hereto, Seller currently owes Vaporizer an additional $16,484.90 primarily for storage services and cash Seller has collected on accounts receivable owned by Vaporizer. Therefore, while reserving all other rights, Vaporizer is hereby exercising its rights of set-off under Section 2.8 of the APA and will not be making the payment of $250,000 that would otherwise be due to Seller under Section 2.5(a)(iii). Vaporizer may exercise additional setoff rights against future amounts otherwise owing to Seller under the APA and reserves all rights to do so in the future.

Best regards,

VAPORIZER LLC

By: _____

Ann Blake,
Chief Financial Officer

cc:   Alan Langer (via email)
      Harris Beach PLLC (via email)

P.O. Box 190 | Mt. Morris, NY 14510
**P.** 585.243.9510
www.americanrocksalt.com

60902

CASE NUMBER:13-CV-7463

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
GRO-WELL BRANDS, INC., GROW-WELL BRANDS CP,
INC., and WESTERN ORGANICS, INC.,

                  Plaintiffs,

        -against-

VAPORIZER LLC,

                 Defendant.
-------------------------------------------------------------------------------X

---

## VERIFIED COMPLAINT

---

# ITKOWITZ PLLC
Attorneys for Plaintiff 475 BUILDING COMPANY LLC
Office and Post Office Address
305 Broadway
Seventh Floor
New York, New York 10007
(212) 822-1400